# EXHIBIT B

# L E A S E

### Between


### LEON HARARY, E.B.,
### a Partnership of the State of New Jersey,

#### Landlord


### and


### JAMES NG, CINDY NG and DAVID KAU,
### with no personal liability, on behalf of a New Jersey Corporation
### to be formed,

#### Tenant


Dated:     July __, 1993

SILLS CUMMIS ZUCKERMAN RADIN TISCHMAN EPSTEIN & GROSS, P.A.
The Legal Center
One Riverfront Plaza
Newark, New Jersey  07102-5400

# TABLE OF CONTENTS

| Section | | Page |
|---|---|---|
| | Premises | |
| 1 | Term - Certificate of Commencement . . . . . . . . | 1 |
| 2 | Rent . . . . . . . . . . . . . . . . . . . . | 2 |
| 3 | Proportionate Share . . . . . . . . . . . . . . | 2 |
| 4 | Additional Rent . . . . . . . . . . . . . . . | 2 |
| 5 | Intentionally Omitted . . . . . . . . . . . . . | 3 |
| 6 | Intentionally Omitted . . . . . . . . . . . . . | 3 |
| 7 | Intentionally Omitted . . . . . . . . . . . . . | 3 |
| 8 | Operating Costs . . . . . . . . . . . . . . . | 3 |
| 9 | Landlord's Obligations . . . . . . . . . . . . | 4 |
| 10 | Common Areas . . . . . . . . . . . . . . . . | 4 |
| 11 | Net Lease . . . . . . . . . . . . . . . . . . | 6 |
| 12 | Alterations . . . . . . . . . . . . . . . . | 6 |
| 13 | Purpose, Trade Name, Restrictions . . . . . . . | 6 |
| 14 | Default in Payment of Rent - Abandonment of Premises - Reletting . . . . . . . . . . . . . . . | 9 |
| 15 | Subletting and Assignment . . . . . . . . . . | 11 |
| 16 | Condition of Premises; Repairs - Clean And Sanitary and Repairs . . . . . . . . . . . . | 13 |
| 17 | Utilities, Services, Taxes, Etc., And HVAC . . | 13 |
| 18 | Mechanics' Liens . . . . . . . . . . . . . . | 15 |
| 19 | Non-Liability of Landlord-Landlord Indemnity . | 15 |
| 20 | Liability Insurance . . . . . . . . . . . . . | 15 |
| 21 | Tenant's Own Insurance . . . . . . . . . . . . | 16 |
| 22 | Mutual Waiver of Subrogation . . . . . . . . . | 16 |
| 23 | Failure To Obtain Insurance . . . . . . . . . | 16 |
| 24 | Unavailability of Fire Insurance . . . . . . . | 17 |
| 25 | Right To Inspect And Exhibit . . . . . . . . . | 17 |
| 26 | Total or Partial Destruction . . . . . . . . . | 18 |
| 27 | Laws and Ordinances . . . . . . . . . . . . . | 19 |
| 28 | Signs . . . . . . . . . . . . . . . . . . . . | 19 |
| 29 | Priority of Fee Mortgages . . . . . . . . . . | 20 |
| 30 | Security Deposit - First Month's Rent . . . . . . . . . . . . . . . . . | 20 |
| 31 | Rules and Regulations Employee Parking . . . . . . . . . . . . . . | 21 |
| 32 | Tenant's Violation of Terms - Re-entry by Landlord . . . . . . . . . . . . . | 22 |
| 33 | Notices . . . . . . . . . . . . . . . . . . . | 23 |
| 34 | Entire Agreement . . . . . . . . . . . . . . . | 23 |
| 35 | Insolvency of Tenant . . . . . . . . . . . . . | 23 |
| 36 | Eminent Domain; Condemnation . . . . . . . . . | 24 |
| 37 | Delivery of Lease And Recording . . . . . . . | 25 |
| 38 | Lease Provisions Not Exclusive . . . . . . . . | 25 |
| 39 | Heirs, etc. . . . . . . . . . . . . . . . . . | 25 |
| 40 | Date of Possession . . . . . . . . . . . . . . | 26 |
| 41 | Real Estate Taxes . . . . . . . . . . . . . . | 26 |
| 42 | Tax Appeals By Landlord . . . . . . . . . . . | 27 |
| 43 | Quiet Enjoyment . . . . . . . . . . . . . . . | 27 |
| 44 | Reservation of Title . . . . . . . . . . . . . | 27 |
| 45 | Outside Storage . . . . . . . . . . . . . . . | 27 |
| 46 | Certificate of Occupancy . . . . . . . . . . . | 28 |
| 47 | Holding Over . . . . . . . . . . . . . . . . . | 28 |
| 48 | Consents To Defaults . . . . . . . . . . . . . | 28 |
| 49 | Interest on Default . . . . . . . . . . . . . | 28 |
| 50 | Financial Statements . . . . . . . . . . . . . | 29 |
| 51 | Table of Contents and Captions . . . . . . . . | 29 |
| 52 | Broker . . . . . . . . . . . . . . . . . . . . | 29 |
| 53 | No Oral Changes . . . . . . . . . . . . . . . | 29 |
| 54 | Merchant's Association . . . . . . . . . . . . | 30 |
| 55 | Interpretation . . . . . . . . . . . . . . . . | 30 |
| 56 | Accord and Satisfaction . . . . . . . . . . . | 30 |
| 57 | Consents . . . . . . . . . . . . . . . . . . . | 30 |
| 58 | Mortgage Protection Clause . . . . . . . . . . | 31 |

[J:\528041\019\24mhoh37.W51]
[07/08/93 11:39am; PRICE_C]

| Section | | Page |
|---|---|---|
| 59 | Water, Standby Sprinkler, Sprinkler Alarm and Sewer (If Any) Charges . . . . . . . . . . . . . | 31 |
| 60 | Business Hours . . . . . . . . . . . . . . . | 32 |
| 61 | Negotiated Lease . . . . . . . . . . . . . . . | 32 |
| 62 | Center . . . . . . . . . . . . . . . . . . . . | 32 |
| 63 | Control of Tenant . . . . . . . . . . . . . . | 33 |
| 64 | Processing Charge . . . . . . . . . . . . . . | 33 |
| 65 | Right of First Refusal . . . . . . . . . . . | 34 |
| 66 | Hazardous Substances . . . . . . . . . . . . . | 35 |
| 67 | Modifications requested by Mortgagee . . . . . | 36 |
| 68 | Reimbursement of Legal Expenses . . . . . . . | 36 |
| 69 | Renewal Option . . . . . . . . . . . . . . . . | 37 |
| 70 | Option to Lease Adjoining Space . . . . . . . | 37 |
| 71 | Contingencies . . . . . . . . . . . . . . . . | 38 |
| | Signatures . . . . . . . . . . . . . . . . . . | 39 |

Schedule A -   The Premises
Schedule B -   Certificate of Commencement
               of Rent
Schedule C -   Payment of Rent
Schedule D -   Landlord Alteration
Schedule E -   Tenant Alteration
Schedule F -   Business Plan

[J:\528041\019\24mhoh37.W51]
[07/08/93 11:39am; PRICE_C]

# L E A S E

**THIS AGREEMENT**, entered into this _____ day of July, 1993,
between LEON HARARY, E.B., a Partnership of the State of New
Jersey, having offices at 1350 Broadway, Suite 1605, New York,
New York 10018, hereinafter referred to as "Landlord", and JAMES
NG, CINDY NG and DAVID KAU, with no personal liability, on behalf
of a New Jersey Corporation to be formed, having offices at
_____, _____, hereinafter
collectively referred to as "Tenant".

## W I T N E S S E T H:

**PREMISES**: Landlord hereby demises and leases unto Tenant
and Tenant hereby hires and takes from Landlord, for the term and
upon the rentals, terms and conditions hereinafter specified, the
premises consisting of the former United Outlet Store containing
approximately 8,000 square feet, and an approximately 2,200
square foot portion of the existing adjoining hallway,
crosshatched on Schedule "A" in its "AS IS" condition except for
completion of the Landlord Alteration described in Section 12
below (the "Premises"), which Premises are a part of a shopping
center known as the Miracle Mall (the "Center") owned by Landlord
on Route 18, East Brunswick, New Jersey, and also includes a
right of access to the Premises and all public areas of the
Center together with the parking spaces in the parking area in
common with other tenants of the Center.  The Premises consists
of approximately 10,200 square feet (measured from the outside
facia of exterior walls and the center line of common walls).

## SECTION 1: TERM - CERTIFICATE OF COMMENCEMENT:

The term of this demise shall be fifteen (15) years begin-
ning on the first to occur of (i) the sixtieth (60th) day after
the day Tenant obtains a construction permit for the Tenant
Alteration (defined below), or (ii) the day Tenant first opens
for business in the Premises (the "Commencement Date"), and
ending at midnight on the day before the fifteenth (15th)

anniversary of the Commencement Date (the "Term"), subject, however, to the terms contained herein. Upon the commencement of the Term, Landlord and Tenant shall execute a Certificate of Commencement in the form attached as Schedule "B".

**SECTION 2: RENT:**

The basic rent during the Term of this Lease ("Basic Rent") shall be the sum of Two Million Seven Hundred Seventy-nine Thousand Five Hundred ($2,779,500.00) Dollars which shall be payable in monthly installments as set forth on Schedule "C" on or before the first day of each month, in advance, at the office of Landlord or at such other place as shall be designated by Landlord, without any prior notice or demand therefor and without any deduction, abatement or set-off for any reason whatsoever. In the event that the Term shall commence on a day other than the first day of a month, then Tenant shall pay to Landlord a proportionate amount for said period.

The Basic Rent and any Additional Rent (as defined in Section 4) are hereinafter referred to as "Rent".

**SECTION 3: PROPORTIONATE SHARE:**

For the purposes of this Lease, Landlord and Tenant agree that the Premises constitute 11.3% of the Center. Tenant's proportionate share of all costs, expenses and costs of the operation of the Center shall be deemed to be 11.3% ("Proportionate Share") unless there is an increase in rental space constructed by Landlord or Tenant leases more space in the Center, at which time the Proportionate Share shall be readjusted.

**SECTION 4: ADDITIONAL RENT:**

(a)  Tenant shall pay as Additional Rent its Proportionate Share of "Operating Costs" as defined in **Section 8** of this Lease. Said monthly sums shall be paid in advance on the first day of each month.

In the event Tenant's Proportionate Share of Operating Costs exceeds the monthly sums provided above, Landlord shall submit an invoice to Tenant at any time during the Term with a

-2-

statement of the actual Operating Costs and Tenant shall forth-
with make payment to Landlord of the amount in excess of the
payments previously made by Tenant for such period.  Tenant's
monthly payment of its Proportionate Share of Operating Costs
shall be increased to coincide with any increase described above.

(b)  All sums of money or charges required to be paid by
Tenant under this Lease, whether or not the same be so
designated, shall be deemed "Additional Rent".  If such amounts
or charges are not paid at the time provided in this Lease, they
shall nevertheless, if not paid when due, be collectible as
Additional Rent with the next installment of rent thereafter
falling due hereunder, but nothing herein contained shall be
deemed to suspend or delay the payment of any amount of money or
charges as the same becomes due and payable hereunder, or limit
any other remedy of Landlord.

**SECTION 5:  INTENTIONALLY OMITTED**

**SECTION 6:  INTENTIONALLY OMITTED**

**SECTION 7:  INTENTIONALLY OMITTED**

**SECTION 8: OPERATING COSTS:**

Operating Costs, for the purposes of this Lease, shall mean
the aggregate of all expenses of operating the common areas of
the Center and its appurtenances and shall include, but shall not
be limited to, the following:  all expenses for maintaining,
managing, operating and repairing the Center and its
appurtenances, including the expenses of normal replacement of
worn out equipment; facilities and installations; the cost of
electricity, water, and other utilities; security, gardening and
other landscaping; snow removal, maintenance and repair of the
parking lot areas, driveways and roof; fire insurance, liability
insurance, rent insurance, taxes as defined in **Section 41** of this
Lease, painting, supplies, sales or use taxes on supplies or
services, wages, salaries, and fringe benefits of all persons
engaged in the operation, maintenance and repair of the Center
and its appurtenances; the charges of any independent contractor
who performs or does any of the work of operating, managing,

-3-

maintaining, or repairing the Center and its appurtenances and
any other expenses or charges of any nature whatsoever, whether
or not herein mentioned, which is in accordance with sound
accounting and management principles generally accepted with
respect to the operation of a first-class shopping center, would
be considered as Operating Costs.

Operating Costs shall not include, however, executive
salaries, leasing commissions, and costs of additional buildings,
if any, for which Landlord is responsible and depreciation,
interest on and amortization of mortgages, franchise, income and
other taxes based upon the income of Landlord, provided the same
shall not have been levied as a substitute for real property
taxes and shall not include any items otherwise constituting such
expense to the extent payment therefor is received from, or
payable by, another tenants of the Center.

### SECTION 9: LANDLORD'S OBLIGATIONS:

Landlord, as part of Operating Costs, shall keep the
driveways and parking area reasonably free of snow and ice, and
maintain all grounds, shrubs and lawns in the Center. Landlord
shall also, as part of Operating Costs, make all structural
repairs (i.e. to the foundation, slab, structural steel supports
and structural portions of the roof) unless such repairs are
necessitated by negligence, acts or omissions of Tenant, its
servants, agents or employees; in which event said repairs shall
be made by Landlord upon reasonable prior notice to Tenant at
Tenant's expense.

### SECTION 10: COMMON AREAS:

The use and occupancy of the Premises shall include the use
in common with others of the common areas and facilities (if
any), as hereinafter are more fully provided. Common areas shall
mean those areas of the Center which, at any given time, are
designated by Landlord for common use by tenants or occupants of
premises within the Center which are devoted to such common use
or are so designated by Landlord.

-4-

In order to establish that the Center, and any portion thereof, is and will continue to remain private property, Landlord shall have the unrestricted right to close (for such periods of time and to the extent necessary, in the opinion or belief of Landlord's attorneys, to be legally sufficient to prevent a dedication thereof, or the accrual of any right in any person or to the public therein) the entire Center, and/or any portion thereof owned or controlled by Landlord, to the general public. In connection therewith, Landlord may, in its discretion, seal off entrances to the Center, or any portion thereof, for periods of at least one (1) day in each calendar year. All common areas and other facilities in or about the Center provided by Landlord shall be subject to the exclusive control of Landlord. Landlord shall have the right to construct, maintain and operate lighting and other facilities on all said areas and improvements; to police the same; to change the area, level, location and arrangement of parking areas and other facilities; to build multi-story parking facilities, to allow anyone designated by Landlord to use the parking facilities without charge (including without limitation the tenants in the building adjacent to the Center and the customers of said tenants); and/or to close temporarily all or any portion of the parking areas or facilities to discourage non-customer parking; and to erect additional buildings, improvements and structures in the common areas including without limitation the parking areas designated from time to time by Landlord. Landlord shall operate and maintain the common facilities in such manner as Landlord in its discretion shall determine, and Landlord shall have full right and authority to employ and discharge all personnel with respect thereto. All common areas and facilities which Tenant may be permitted to use and occupy are to be used and occupied under a non-exclusive revocable license, and if such license be revoked or if the amount of such areas be changed or diminished, Landlord shall not be subject to any liability nor shall Tenant be entitled to any compensation or diminution or abatement of

[J:\528041\019\24mhoh37.W51]
[07/08/93 10:16am; PRICE_C]

Rent nor shall revocation or diminution of such areas be deemed constructive or actual eviction.

Notwithstanding anything to the contrary, (i) Landlord shall not erect any buildings or structures in that portion of the common areas designated as the "No-Build Area" on Schedule "A", and (ii) Landlord shall not operate and maintain the common areas in such a manner so as to materially and adversely affect Tenant's ingress, egress, parking and visibility.

**SECTION 11: NET LEASE:**

This Lease is a net lease. The Basic Rent shall be absolutely net to Landlord so that except as expressly provided in this Lease this Lease shall yield, net, to Landlord, the Basic Rent during the Term.

**SECTION 12: ALTERATIONS:**

Landlord shall complete at its own expense and in a good and workmanlike manner, all of the alterations set forth on Schedule "D" (the "Landlord Alteration"), and Tenant shall complete, at its own expense and in a good and workmanlike manner, all of the alterations set forth on Schedule "E" (the "Tenant Alteration").

**SECTION 13: PURPOSE, TRADE NAME, RESTRICTIONS:**

(a)  Tenant covenants and agrees to trade and do business under the name "Park's Market Center" and to use the Premises only as a food market and service center catering in general to the Asian population of Central New Jersey, substantially in accordance with the Business Plan annexed hereto as Schedule "F" (although any inconsistency between a term or provision contained in the main body of this Lease and a term or provision contained in Schedule "F" shall be resolved in favor of the term or provision contained in the main body of this Lease) and further agrees not to use or permit the Premises to be used for any other purposes without the prior written consent of Landlord, which consent Landlord may, at its sole discretion, withhold. No less than seventy (70%) percent of the floor area of the Premises shall be used for the sale, preparation and/or storage of food. In no event may animal bodies, skins or carcasses be hung for

[J:\528041\019\24mhoh37.W51]
[07/08/93 10:16am; PRICE_C]

_such that same would be ____
visible through the ~~draft~~ windows of the Premises._

display in the Premises ~~, although this will not prevent same from being hung in the cold storage area not open for public display.~~

(b) **Covenants Against Competition.** Tenant, or any indivi-
dual, firm, or corporation that controls Tenant or is controlled
by Tenant or is affiliated with Tenant, shall not own, operate,
or become financially interested in a business similar to the one
conducted on the premises within ten (10) miles in any direction
from the premises, the mileage to be measured on a straightline
basis on a map, not following contours of the land and streets.
Tenant agrees, at its expense, to strictly enforce the provisions
of this paragraph (b) against all of the above referenced indivi-
duals, firms and corporations and to obtain their agreement to
this paragraph for the benefit of Landlord.

Landlord shall not lease any space in the Center to any
tenant or otherwise permit the occupancy of any tenant whose
principal use is a use described in Section 13(a) above; nor
shall Landlord lease any space in the Center to any tenant or
otherwise permit the occupancy of any tenant whose principal use
is a service use catering in general to Asian customers, if that
particular use is already in place in the Premises.

(c) Tenant covenants and agrees that Tenant at its own
expense will keep the Premises free of insects, rodents, vermin
and other pests. Tenant shall, ten (10) days prior to the
commencement of the Term, deliver to Landlord, a certificate and
service contract from an approved exterminating or similar
service providing that the Premises shall be inspected quarterly
and kept free of insects, rodents, vermin and other pests.
Tenant further covenants and agrees that it shall not, at any
time during the Term, keep at the Premises any animals of any
kind whatsoever.

(d) Tenant shall not use or permit the use of any
apparatus, or sound reproduction or transmission, or any musical
instrument, in such manner that the sound so reproduced,
transmitted or produced shall be audible beyond the confines of
the Premises and will not use any other advertising medium

-7-

including, without limitation, flashing lights or searchlights which may be heard or experienced outside of the Premises.

(e)  Tenant shall not cause or permit objectionable odors to emanate or be dispelled from the Premises (it being acknowledged by Tenant that it is fully responsible for the Premises being properly vented in light of its particular use) nor shall Tenant solicit business, distribute handbills or other advertising matter or hold demonstrations in the parking areas, walkways or other common areas of the Center.

(f)  Tenant shall not use the plumbing facilities for any other purpose than that for which they are constructed and will not permit any foreign substance of any kind to be thrown therein and the expense of repairing any breakage, stoppage, seepage or damage, whether occurring on or off the Premises resulting from a violation of this provision by Tenant or Tenant's employees, agents or invitees shall be borne by Tenant.  All grease traps and other plumbing traps shall be kept clean and operable by Tenant at Tenant's own cost and expense.

(g)  Tenant shall not place or cause or permit to be placed within the Premises amusement devices of any kind.

(h)  Tenant agrees not to suffer, permit or commit any waste on the Premises, nor allow, suffer or permit the Premises or any use thereof to constitute a nuisance or unreasonably to interfere with the safety, comfort or enjoyment of the Center by Landlord or any other occupants of the Center or their customers, invitees or any others lawfully in or at the Center.  Upon written notice by Landlord to Tenant that any of the aforesaid is occurring, Tenant agrees forthwith to cease and discontinue the same and within ten (10) days thereafter to make such changes in the Premises and/or install or remove such apparatus or equipment therein or therefrom as may be required by Landlord for the purpose of obviating any such condition.

(i)  Notwithstanding anything in this Lease to the contrary, Tenant shall not make any penetrations into the roof of the Premises or the Center, without the prior written consent of

-8-

Landlord, not to be unreasonably withheld or delayed. If Landlord grants its permission for such roof penetration, such work shall be performed by a contractor designated by Tenant at Tenant's sole cost and expense, the designation of such contractor to be subject to the prior written consent of Landlord, not to be unreasonably withheld or delayed. In the event that Tenant violates any provision of this subparagraph (i), Landlord may, at its option, repair or replace any portion of the roof of the Premises requiring repairing or replacing at any time during the term of this Lease, at Tenant's sole cost and expense. In addition, in the event of such breach by Tenant, Landlord may, at its option, repair or replace any portion of the roof of the entire Center which requires such repairing or replacing as a result of Tenant's penetration of the roof in breach of this subparagraph (i). Tenant shall be liable for any and all damages (direct, indirect and consequential) to Landlord and any and all other tenants of the Center, resulting from Tenant's breach of the provisions of this subparagraph (i).

(j) Tenant shall not under any circumstances make any penetrations to the foundation or any other structural portions of the Premises.

(k) Tenant shall keep the windows in the Premises clean and free from grease and dirt.

(l) Tenant shall provide store identification on its shopping carts; provide a regular program of removing the shopping carts from the common areas and returning them to the Premises or the sidewalk in front of the Premises so as to not create a nuisance and not impair pedestrian access and movement; and remove all broken shopping carts from the Center.

### SECTION 14: DEFAULT IN PAYMENT OF RENT - ABANDONMENT OF PREMISES - RELETTING:

Tenant shall, without any previous demand therefor, pay to Landlord, or its agent, the Rent at the times and in the manner herein provided. In the event of the non-payment of the Rent, or any installment thereof, at the times and in the manner above

[J:\528041\019\24mhoh37.W51]
[07/08/93 10:16am; PRICE_C]

provided, and if the same shall remain in default for five (5) days, TIME BEING OF THE ESSENCE, or if Tenant shall be dispossessed for non-payment of Rent, or if the Premises shall be deserted or vacant for fifteen consecutive days, Landlord or its agents shall have the right to and may enter the Premises as the agent of Tenant, either by force or otherwise, without being liable for any prosecution or damages therefor, and may relet all or part of the Premises (which re-letting may be in conjunction with the letting of other space in the Center) as the agent of Tenant, and receive the rent therefor, upon such terms as shall be reasonably satisfactory to Landlord, and all rights of Tenant to repossess the Premises under this Lease shall be forfeited. Such re-entry by Landlord shall not operate to release Tenant from any Rent to be paid or covenants to be performed hereunder during the full term of this Lease. For the purpose of reletting, Landlord is authorized to make such reasonable repairs or alterations in or to the Premises as may be reasonably necessary to place the same in the condition they were at the commencement of the Term. Tenant shall be liable to Landlord for the reasonable cost of such repairs or alterations and all reasonable expenses of such reletting. If the sum realized or to be realized from the reletting is insufficient to satisfy the Rent provided in this Lease, Landlord may require Tenant to pay on demand liquidated damages equal to the difference between the Rent reserved for the remainder of the Term from the date of Tenant's default, and the fair rental value of the Premises during such period of time, discounted to present worth at six (6%) percent per annum. Tenant shall not be entitled to any surplus accruing as a result of the reletting. Landlord shall have the right, as agent of Tenant, to take possession of any furniture, fixtures or other personal property of Tenant found in or about the Premises after Tenant has vacated or abandoned the Premises, and sell the same at public or private sale and to apply the proceeds thereof to the payment of any monies becoming due under this Lease, Tenant hereby waiving the benefit of all

-10-

present and future laws exempting property from execution, levy and sale on distress or judgment. Tenant agrees to pay, as Additional Rent, all reasonable attorney's fees and other expenses incurred by Landlord in enforcing Tenant's obligation to pay Rent or any other default of Tenant, whether or not a trial ensues.

**SECTION 15: SUBLETTING AND ASSIGNMENT:**

Tenant may assign or sublease the within Lease to any party subject to the following:

(A)   In the event that Tenant desires to assign the Lease or sublease the Premises or any part thereof to any other party, the terms and conditions of such assignment or sublease shall be communicated to Landlord in writing prior to the effective date of any such assignment or sublease, and, prior to such effective date, Landlord shall have the option exercisable in writing to Tenant, to recapture the within lease or part proposed to be sublet, and Tenant shall be fully released from any and all obligations hereunder as to the recaptured space; provided, however, that Landlord shall have no recapture rights with respect to an assignment as part of a sale of Tenant's business to a third party in a bona-fide arm's length commercial transaction, or to proposed subleases or licenses or concessions to run the non-food portions of Tenant's business as described in Section 13(a) above.

(B)   In the event that Landlord elects not to recapture the Lease or part thereof as the case may be in accordance with (A) above, Tenant may nevertheless assign this Lease or sublet the whole or any portion of the Premises so offered to Landlord, subject to Landlord's prior written consent, which consent shall not be unreasonably withheld, and subject to the consent of any mortgagee, trust deed holder or ground lessor, on the basis of the terms and conditions enumerated herein in this Subparagraph (B).  However, Landlord shall not be deemed unreasonable if it refuses to consent to (i) any proposed sublease or license of the food department, (ii) any proposed assignment of the Lease or

-11-

sublease to a tenant, subtenant or other occupant of the Center
(or to a subsidiary or affiliate), or (iii) if, in the reasonable
judgment of Landlord, the business of such proposed assignee or
subtenant is not compatible with the type of occupancy of the
Center, violates any exclusive granted to any other tenant in the
Center, or such business will create increased use of the common
areas of the Center or is to any State, Federal or municipal
agency or bureau.

      (1)  Tenant shall provide to Landlord the name and
address of the assignee or sublessee.

      (2)  The assignee or sublessee shall assume, by
written instrument, all of the obligations of this
Lease, and a copy of such assumption agreement shall be
furnished to Landlord within ten (10) days of its
execution.

      (3)  Tenant and each assignee shall be and remain
liable for the observance of all the covenants and
provisions of this Lease, including, but not limited
to, the payment of Basic Rent, Percentage Rent and
Additional Rent reserved herein, through the entire
Term of this Lease, as the same may be renewed,
extended or otherwise modified.

In the event that Landlord shall consent to an assignment or
subletting, then all rents or other payments received by Tenant
in excess of the Rent due from Tenant to Landlord pursuant to
this Lease shall be paid to Landlord as Additional Rent.  On
demand, any assignee or subtenant shall make payments directly to
Landlord, which payments shall not relieve Tenant from any of its
obligations pursuant to this Lease, but shall be in reduction of
said obligations.  Notwithstanding the foregoing, Tenant shall be
entitled to retain all rents or other payments in excess of the
Rent due Landlord in connection with (1) a sale of Tenant's
business to a third party in a bona-fide arm's length commercial
transaction, or (2) a sublicense, license or concession agreement
respecting the non-food portions of Tenant's business.

[J:\528041\019\24mhoh37.W51]
[07/08/93 10:16am; PRICE_C]

## SECTION 16:  CONDITION OF PREMISES; REPAIRS -
## CLEAN AND SANITARY AND REPAIRS:

Tenant shall keep the Premises in good condition, repair and appearance.  Tenant shall quit and surrender the Premises at the end of the Term in good condition, reasonable wear and tear excepted, and shall not make any alterations, additions or improvements to the Premises without the prior written consent of Landlord, which consent shall not be unreasonably withheld; provided, however, in the event Landlord does consent to Tenant's making any alterations, additions or improvements, Landlord reserves the right, thirty (30) days prior to the end of the Term, to demand that Tenant remove said alterations or improvements or leave same.  In the event that Landlord requires the removal of said alterations or improvements, then Tenant shall restore the Premises to their condition prior to the installation of said alterations, additions or improvements.  All erections, alterations, additions and improvements, which are permanent in character, which may be made upon the Premises either by Landlord or Tenant, except furniture or movable fixtures, machinery and equipment installed at the expense of Tenant, shall be the property of Landlord and shall remain upon and be surrendered with the Premises as a part thereof at the expiration or sooner termination of this Lease, without compensation to Tenant, unless removal is required by Landlord as aforesaid.  Tenant further agrees to keep the Premises and all parts thereof, including, but not limited to, the loading docks, electrical wiring, plumbing and heating, ventilating and air conditioning equipment, platforms, windows, walkways, exits and entrances to the Premises, in a clean and sanitary condition and free from trash, snow, ice, inflammable materials and other objectionable matter.

### SECTION 17: UTILITIES, SERVICES, TAXES, ETC., AND HVAC:

(a)   Tenant shall furnish heat and air conditioning at its own cost and expense.

[J:\528041\019\24mhoh37.W51]
[07/08/93 10:16am; PRICE_C]

(b)  Tenant shall repair all utility, ventilating, heating, air conditioning, electrical, gas and other utility lines within the Premises except if damage outside of the Premises is caused by the negligence, acts or omissions of Tenant, its agents, servants or employees, in which event Tenant shall likewise repair same outside of the Premises.  Tenant shall replace, at its own expense, any and all glass which may be broken in and on the Premises.

(c)  Tenant shall pay all costs for electricity, water, standby sprinkler charges, repairs to the sprinkler system, gas and other utilities and services consumed by it.

(d)  In the event that any utility deposits are necessary, Tenant shall pay said deposits to the utility company.

(e)  Tenant agrees, during the hours the Premises is open for business, to operate the heating, ventilating and air-conditioning equipment serving the Premises so that the conditions inside the Premises are maintained within the range of the conditions in the enclosed mall portion of the Center (the "Mall") so that heat, ventilation and cooled air are not unduly drained from the Mall.  Tenant shall pay to Landlord as Additional Rent an amount equal to One Hundred and 00/100 ($100.00) Dollars per day for each day that Tenant is in violation of the terms and conditions of this **Section 17 (e)** after written notice from Landlord, which sum is agreed to be just and reasonable compensation to Landlord for Tenant's violation of such terms and conditions.  Any amounts so collected shall be applied to reduce the Operating Costs paid by other tenants and occupants of the Center.

(f)  Tenant shall enter into a maintenance agreement with a firm reasonably acceptable to Landlord to service the heating, ventilating and air conditioning systems (HVAC) servicing the Premises.  Tenant shall pay the full cost of such maintenance agreement.

-14-

**SECTION 18: MECHANICS' LIENS:**

In the event that any mechanic's lien is filed against the Premises as a result of alterations, additions or improvements made by Tenant, Tenant shall, within ten (10) days after receiving notice from Landlord, remove said lien or post any bond which may be reasonably required, which bond shall be with adequate surety. In the event that Tenant fails to file a bond as set forth above, then Landlord may, at its option, terminate this Lease and may pay said lien, without inquiring into the validity thereof, Tenant shall forthwith reimburse Landlord the total expense incurred by Landlord in discharging said lien, as Additional Rent, and Tenant shall be and remain liable to Landlord for all damages and losses suffered by it in the same manner as if this Lease were terminated for any other default of Tenant.

**SECTION 19: NON-LIABILITY OF LANDLORD - LANDLORD INDEMNITY:**

(a) Landlord shall not be responsible for the loss of or damage to property, or injury to persons, including Tenant, occurring in or about the Premises by reason of any existing or future condition, defect, matter or thing in the Premises or the Center or for the acts, omissions or negligence of other persons or tenants in and about the Center. Tenant agrees to indemnify and save Landlord harmless from all claims and liability for loss of or damage to property, or injuries to persons occurring in or about the Premises due to the negligent acts or omissions of Tenant, its servants, agents, employees or invitees.

(b) The liability of Landlord shall in any event be limited to its interest in the Center and Tenant agrees that, in the event of any claim or action against Landlord, Tenant shall not look to any assets of Landlord or any of its partners other than the Center.

**SECTION 20: LIABILITY INSURANCE:**

Tenant, at its cost, shall maintain public liability and property damage insurance with liability limits of not less than Five Million ($5,000,000.00) Dollars, combined single limit,

[J:\528041\019\24mhoh37.W51]
[07/08/93 10:16am; PRICE_C]

insuring against all liability of Tenant, its agents, servants and employees arising out of and in connection with Tenant's use of the Premises and the Center. All of the aforesaid insurance shall insure both Tenant and Landlord, who shall be named as co-insureds, and Tenant shall deliver to Landlord, ten (10) days prior to the expiration of said policy, a renewal thereof.

**SECTION 21: TENANT'S OWN INSURANCE:**

Tenant may effect, for its own account, any insurance not required under the provisions of this Lease, but any insurance effected by Tenant on the Premises or any part of the Center, whether or not required pursuant to this Lease, shall be for the mutual benefit of Landlord and Tenant and shall be subject to all provisions of this Lease.

**SECTION 22: MUTUAL WAIVER OF SUBROGATION:**

It is covenanted and agreed by and between the parties hereto that Tenant shall relieve Landlord of all liability for loss or damage to Tenant's property, whether real or personal, caused by fire and/or the perils covered in a standard form fire insurance policy with Extended Coverage, due to any acts of commission or omission of Landlord; and Landlord shall relieve Tenant of all liability for loss or damage to Landlord's property, whether real or personal, caused by fire and/or the perils covered in a standard form fire insurance policy with Extended Coverage, due to any acts of commission or omission of Tenant.

**SECTION 23: FAILURE TO OBTAIN INSURANCE:**

If any of the policies of insurance as in this Lease provided to be obtained and maintained by Tenant or Landlord cannot be obtained and/or kept in force through Tenant's fault, and Tenant shall fail to commence to cure, remedy and correct the condition which makes it impossible to obtain and keep in force said policies within fifteen (15) days after written notice given by Landlord to Tenant, and Tenant fails, neglects or refuses to proceed diligently to cure such condition, Landlord may terminate this Lease by giving at least fifteen (15) days' notice of such

[J:\528041\019\24mhoh37.W51]
[07/08/93 10:16am; PRICE_C]

termination to Tenant, and this Lease shall terminate at the expiration of said fifteen (15) days with the same force and effect as if that were the original expiration date thereof, and Tenant shall be and remain liable to Landlord for all damages and losses suffered by it in the same manner as if this Lease were terminated for any other default of Tenant. In lieu of exercising such right of termination, Landlord may, at its option, obtain such policies at regular or increased rates and pay the premiums therefor, and Tenant shall reimburse Landlord for the amount of such premium upon demand, and, if not paid, the amount thereof, together with interest at the Default Rate, shall be added to the amount of the next month's rent as Additional Rent.

**SECTION 24: UNAVAILABILITY OF FIRE INSURANCE:**

If, because of Tenant's occupancy, it shall be impossible to obtain fire insurance on the Premises and/or the Center for full insurable value and at standard rates and in fire insurance companies licensed in the State of New Jersey, Landlord may, if Landlord so elects, at any time thereafter, terminate this Lease and the Term thereof on giving to Tenant thirty (30) days' notice in writing of Landlord's intention so to do, and, upon the giving of such notice, this Lease and the Term thereof shall terminate and come to an end, and Tenant shall be and remain liable to Landlord for all damages and losses suffered by it in the same manner as if this Lease were terminated for any other default of Tenant.

**SECTION 25: RIGHT TO INSPECT AND EXHIBIT:**

Landlord, or its agent, shall have the right to enter the Premises at reasonable hours in the day, and at night in the case of emergency, to examine the same, or to run telephone or other wires, or to make such repairs, additions or alterations as it shall deem necessary for the safety, preservation or restoration of the improvements, or for the safety or convenience of the occupants or users thereof (there being no obligation, however, unless expressly set forth herein, on the part of Landlord to make any such repairs, additions or alterations), or to exhibit

-17-

the same to prospective purchasers and put upon the Premises a
suitable "For Sale" or "To Let" sign.  For twelve (12) months
prior to the expiration of the Term, Landlord, or its agents, may
similarly exhibit the Premises to prospective tenants.

**SECTION 26: TOTAL OR PARTIAL DESTRUCTION:**

In the event of:

(a)  the total destruction of the Premises or the Center by
fire, explosion, the elements or otherwise during the Term or
previous thereto, or

(b)  such partial destruction thereof as to render the
Premises wholly untenantable or unfit for occupancy,
and, in the case of (a) or (b), should the Premises be so badly
damaged that the same cannot be repaired within one hundred
eighty (180) days from the happening of such damage, then and in
such case the term hereby created shall, at the option of
Landlord or Tenant, to be exercised by notice sent within thirty
(30) days from the date of such damage, cease and become null and
void from the date of such damage or destruction, and Tenant
shall immediately surrender the Premises and all Tenant's
interest therein to Landlord, and shall pay rent only to the time
of such damage, in which event Landlord may re-enter and
repossess the Premises thus discharged from this Lease and may
remove all parties therefrom.  If neither Landlord nor Tenant
exercises its option to cancel, or should the Premises be
rendered untenantable and unfit for occupancy, but yet be
repairable within one hundred eighty (180) days from the
happening of said damage, Landlord shall, provided there are
sufficient casualty insurance proceeds available, enter and
repair or rebuild the Premises as nearly as possible to their
previous condition with reasonable speed and the Rent, to the
extent hereinafter provided, shall continue to be paid while
repairs are being made.  The Rent accrued and accruing shall
cease and determine if the Premises are totally unusable by
Tenant.  If a portion is usable, the Rent shall be reduced pro
rata for the untenantable portion until the repairs are

-18-

completed. Tenant shall immediately notify Landlord in case of fire or other damage to the Premises.

### SECTION 27: LAWS AND ORDINANCES:

Tenant agrees to observe and comply with all laws, ordinances, rules and regulations of the Federal, state, county and municipal authorities applicable to the business to be conducted by Tenant in the Premises, including the making of structural and non-structural repairs or alterations due to Tenant's occupancy. If any of such laws, ordinances, rules and regulations shall require structural alterations which would have been required irrespective of the nature of the tenancy, then in such event the same shall be complied with by Landlord and shall be deemed part of Operating Costs. Tenant agrees not to do or permit to be done at any time during the Term anything in the Premises, or keep anything therein, which will increase the rate of fire insurance premiums on the Center or any part thereof, or on the property kept therein.

### SECTION 28: SIGNS:

No sign shall be affixed to or placed upon any exterior part of the Premises or the Center by Tenant, except in such manner, and of such size, design and color as shall be approved in advance by Landlord in writing. Tenant is hereby granted the right to place a facade sign over the Premises in compliance with Township Code requirements and Landlord's signage specifications for the Center, to include the requirement that facade signs consist of back-lit individual channel letters. Tenant has no rights on the Center pylon as it presently exists, but this shall not preclude Tenant from making an application to the Township of East Brunswick for additional space on the pylon on which Tenant may place its sign. Landlord will cooperate with Tenant in any such application provided that Landlord shall not be required to incur any expense in connection therewith.

-19-

## SECTION 29: PRIORITY OF FEE MORTGAGES:

This Lease shall be subject and subordinate to any present or future mortgages of the entire fee interest of the land and building of which the Premises are a part and any renewals, modifications, replacements or extensions thereof. No further document shall be necessary to effect said subordination. Tenant shall, however, on demand of Landlord, execute, acknowledge and deliver to any mortgagee a subordination agreement or an agreement to attorn to such mortgagee as landlord if such mortgagee becomes landlord hereunder. If the holder of any mortgage of the entire fee interest of the land and building of which the Premises are a part requires that this Lease have priority over such mortgage, Tenant shall, upon request of such holder, execute, acknowledge and deliver to such holder an agreement acknowledging such priority. If Tenant does not execute, acknowledge and deliver same within ten (10) days following request for same by Landlord, then Tenant shall be deemed to have appointed Landlord as its attorney-in-fact to so execute, acknowledge and deliver such instrument.

## SECTION 30: SECURITY DEPOSIT - FIRST MONTH'S RENT:

(a)  To secure the covenants and promises of Tenant contained herein, Tenant shall, upon the execution hereof, deposit with Landlord the sum of $35,700.00 in cash, as a security deposit (the "security deposit"). On or before the twenty-fifth (25th) month of the Term, and on or before each date thereafter that the Basic Rent increases during the Term (including renewal terms), Tenant shall deposit with Landlord such additional sums so that the security deposit on hand is at all times equal to three (3) months' Basic Rent then payable hereunder; provided, however, that if any Rent due hereunder is not paid within ten (10) days following the due date thereof, then Tenant will, on demand from Landlord, and on or before each date thereafter that the Basic Rent increases during the Term (including renewal terms), deposit with Landlord such additional sums so that the security deposit on hand is at all times equal

-20-

to five (5) months' Basic Rent then payable hereunder. The total sum shall be returned to Tenant without interest at the expiration of the Term provided Tenant has performed in accordance with the terms hereof. If Landlord applies any part of the security deposit to cure any default of Tenant, Tenant shall, upon demand, deposit with Landlord the amount so applied so that Landlord shall have the amount of the full security deposit on hand at all times during the Term of this Lease. If, at the end of the term, repairs are necessary to correct any condition beyond ordinary wear and tear, then the security deposit, or a portion thereof, may be used by Landlord to make such repairs and the balance remaining shall be returned to Tenant. The security deposit shall not be mortgaged, assigned or encumbered by Tenant. Tenant hereby waives any future law or laws which may require Landlord to segregate the security deposit or to pay interest on the security deposit.

(b)   Upon the execution hereof, Tenant shall pay to Landlord the first month's Basic Rent of $11,900.00, and $2,337.50 representing one-twelfth (1/12th) of the estimated annual Operating Costs.

### SECTION 31: RULES AND REGULATIONS; EMPLOYEE PARKING:

(a)   Reasonable rules and regulations regarding the Premises and the Center, including the walkways and parking areas, and the use thereof, which may hereafter be promulgated by Landlord, shall be observed by Tenant and Tenant's employees, agents and business invitees. Landlord reserves the right to rescind any rules promulgated hereafter, and to make such other and further rules and regulations as in its reasonable judgment may from time to time be desirable for the safety, care and cleanliness of the Premises and the Center and for the preservation of good order therein, which rules, when so made and reasonable notice given to Tenant, shall have the same force and effect as if originally made a part of this Lease. Such other and further reasonable rules shall not, however, be inconsistent with the proper and

[J:\528041\019\24mhoh37.W51]
[07/08/93 10:16am; PRICE_C]

rightful enjoyment by Tenant of the Premises and the Center in the conduct of its business.

(b)   In the event that Tenant's employees park in an area other than that designated by Landlord, then, after notice, Tenant shall pay to Landlord the sum of Ten and 00/100 ($10.00) Dollars per day for each car of its employees which is parked in an area other than that designated by Landlord for employee parking, which sum is agreed to be just and reasonable compensation to Landlord for each such parking violation.

### SECTION 32: TENANT'S VIOLATION OF TERMS - RE-ENTRY BY LANDLORD:

In case of violation by Tenant of any of the covenants, agreements and conditions of this Lease, or of the rules and regulations hereafter to be reasonably established by Landlord, and upon failure to discontinue such violation within twenty (20) days after notice thereof given to Tenant, unless a greater time is reasonably necessary to cure said violation, this Lease shall thenceforth, at the option of Landlord, become null and void, and Landlord may re-enter without further notice or demand.  The rent for the remainder of the Term in such case shall become due and be paid, and Tenant shall be liable for all loss or damage resulting from such violation as aforesaid.  No waiver by Landlord of any violation or breach of condition by Tenant shall constitute or be construed as a waiver of any other violation or breach of condition, nor shall lapse of time after breach of condition by Tenant before Landlord shall exercise its option under this Section operate to defeat the right of Landlord to declare this Lease null and void and to re-enter upon the Premises after the said breach or violation.  Landlord shall have the option of correcting said default and charging the cost thereof to Tenant as Additional Rent, which shall be due and payable with the next rent payment, together with interest at the Default Rate.

[J:\528041\019\24mhoh37.W51]
[07/08/93 10:16am; PRICE_C]

## SECTION 33: NOTICES:

All notices and demands, legal or otherwise, incidental to this Lease, or the occupancy of the Premises, shall be in writing. If Landlord or its agent desires to give or serve upon Tenant any notice or demand, it shall be sufficient to send a copy thereof by certified mail, return receipt requested, or by nationally recognized overnight courier, addressed to Tenant at the Premises. Notices from Tenant to Landlord shall be sent by certified mail, return receipt requested, or by nationally recognized overnight courier, at the address at the beginning of this Lease and a copy thereof to Sills Cummis Zuckerman Radin Tischman Epstein & Gross, Attention: Morris Yamner, Esq., One Riverfront Plaza, Newark, New Jersey 07102-5400, or to such other party or place as Landlord or Tenant may from time to time designate in writing. The date of receipt or rejection, as evidenced by the green receipt card or bill of lading, as the case may be, shall be considered as the date of service.

## SECTION 34: ENTIRE AGREEMENT:

This Lease contains all agreements made between the parties hereto. No representative or agent of Landlord or Tenant is authorized to make any representations or to alter or modify this Lease or any of the options in this Lease contained and provided for in any way. Any additions, alterations, changes, or modifications to or in this agreement or any other agreements hereafter made or conditions created, to be binding upon the parties hereto, must be in writing and signed by said parties, and it is agreed that none of the provisions of this Lease, including this provision, can be waived, except by writing duly signed by the parties hereto.

## SECTION 35: INSOLVENCY OF TENANT:

It is further agreed that if at any time during the Term of this Lease Tenant shall make any assignment for the benefit of creditors, or be decreed insolvent or bankrupt according to law, or if a receiver shall be appointed for Tenant, and the same is not dismissed within thirty (30) days, then Landlord may, at its

[J:\528041\019\24mhoh37.W51]
[07/08/93 10:16am; PRICE_C]

option, terminate this Lease, exercise of such option to be evidenced by notice to that effect served upon the assignee, receiver, trustee or other person in charge of the liquidation of the property of Tenant or Tenant's estate, but such termination shall not release or discharge any payment of rent payable hereunder and then accrued, or any liability then accrued by reason of any agreement or covenant herein contained on the part of Tenant or Tenant's legal representatives.  Anything in this **Section 35** to the contrary notwithstanding, if in any bankruptcy or reorganization proceedings the full Rent payable to Landlord shall be paid and Tenant shall continue to observe all the other terms and conditions of this Lease, Landlord's right to terminate shall not be operative.

### SECTION 36: EMINENT DOMAIN; CONDEMNATION:

(a)  If the whole of the Premises shall be taken under the power of eminent domain, then this Lease shall be terminated as of the day possession shall be taken.

(b)  If more than twenty-five (25%) percent of the floor area of the Premises, or if more than fifty (50%) percent of the common parking area, or if more than fifty (50%) percent of all of the ground level floor area of the Center shall be taken under power of eminent domain, either Landlord or Tenant may terminate this Lease by written notice given within thirty (30) days after the date of surrendering possession to the public authority pursuant to such taking, and if neither Landlord nor Tenant elects to terminate this Lease, Landlord shall restore and adapt the remaining Premises, and the rent shall be reduced as described in Paragraph (c) of this Section.

(c)  If twenty-five (25%) percent or less of the floor area of the Premises, or fifty (50%) percent or less  of the common parking area, or fifty (50%) percent or less of all of the ground level floor area of the Center shall be taken under the power of eminent domain, this Lease shall not terminate but shall continue in full force and effect, except that the Rent shall be reduced in the same proportion that the floor area of the Premises so

-24-

taken bears to the total floor area demised to Tenant at the time of such taking, and Landlord shall, at its own cost and expense, making all necessary restorations to the Premises as to constitute the Premises or the building of which the Premises are a part, a complete architectural unit.

(d) All damages awarded for any taking under the power of eminent domain, whether for the whole or a part of the Premises, shall belong to and be the sole property of Landlord, whether such damages shall be awarded as compensation for diminution in value to the leasehold or to the fee of the premises; provided, however, that Landlord shall not be entitled to any award made to Tenant for loss of or damage to Tenant's trade fixtures.

(e) If this Lease is terminated as provided in this Section, Tenant shall pay all Rent and additional charges and perform all other covenants up to the day that possession is so taken by public authority and Landlord shall make a proportionate refund of any Rent or additional charges paid by Tenant in advance.

**SECTION 37: DELIVERY OF LEASE AND RECORDING:**

No rights are to be conferred upon Tenant until this Lease has been signed by Landlord and an executed copy of the Lease has been delivered to Tenant.

This Lease shall not be recorded; however, Landlord shall have the right to record a short-form or memorandum thereof, at Landlord's expense, at any time during the term hereof.

**SECTION 38: LEASE PROVISIONS NOT EXCLUSIVE:**

The rights and remedies of Landlord contained in this Lease are not intended to be exclusive but as additional to all other rights and remedies Landlord would otherwise have by law.

**SECTION 39: HEIRS, ETC.:**

All of the terms, covenants and conditions of this Lease shall inure to the benefit of, and be binding upon, the respective heirs, executors, administrators, successors and assigns of the parties hereto.

[J:\528041\019\24mhoh37.W51]
[07/08/93 10:16am; PRICE_C]

## SECTION 40: DATE OF POSSESSION:

Landlord shall not be liable for failure to give possession of the Premises upon the commencement date by reason of the fact that the Premises are not ready for occupancy, or due to a prior tenant wrongfully holding over or any other person wrongfully in possession, or because of Landlord's failure to complete the Landlord Alteration, or for any other reason; in such event, the Rent shall not commence until possession is given or is available. If Landlord has not completed the Landlord Alteration ~~two hundred~~ thirty (30) ~~seventy (270)~~ days of the date set forth in Section 1 of this Lease, Tenant may terminate this Lease by giving Landlord ten (10) days' written notice and neither party shall have any obligation to the other except that Landlord shall return to Tenant without interest, any moneys it has received for Rent and the security deposit under this Lease and the parties shall have no claim against the other.

## SECTION 41: REAL ESTATE TAXES:

The term "real estate taxes" shall mean all taxes imposed on the Center, special assessments, water and sewer charges and other governmental charges not levied against the land and buildings. If the system of taxation shall be changed during the term of this Lease, or any extension thereof, so that in lieu of, or in addition to, the regular municipal real estate taxes now assessed or levied against real property, a tax shall be imposed on such rental income or rental value, or on some other basis, and Landlord shall be burdened in part or in whole with such additional tax or taxes, Tenant shall pay or reimburse Landlord its Proportionate Share of the amount of such substitute or additional tax or taxes. If Landlord and Tenant cannot agree on such computation, the matter shall be submitted to arbitration in Newark, New Jersey in accordance with the rules of the American Arbitration Association.

[J:\528041\019\24mhoh37.W51]
[07/08/93 10:16am; PRICE_C]

**SECTION 42: TAX APPEALS BY LANDLORD:**

If Landlord shall institute a tax appeal, and said tax appeal shall result in a reduction in taxes, then Tenant shall pay to Landlord its Proportionate Share of Landlord's cost of said appeal, but in no event shall that amount exceed the reduction in taxes and Tenant shall receive or be credited with its Proportionate Share of any refund or reduction.

Tenant shall cooperate in any proceedings described herein. Tenant shall be entitled to its Proportionate Share of the refund, if any (to the extent the refund is allocable to a portion of the Term), after Landlord deducts any and all costs and expenses.

**SECTION 43: QUIET ENJOYMENT:**

Landlord represents that it has the full right and power to execute and perform this Lease and to grant the estate demised herein, and that Tenant, on payment of the Rent herein reserved and performing the covenants and agreements hereof, shall peaceably and quietly have, hold and enjoy the Premises and all rights, easements, appurtenances and privileges belonging or in anywise appertaining thereto during the Lease Term without molestation or hindrance of any person whomsoever.

**SECTION 44: RESERVATION OF TITLE:**

Tenant may not consent to the reservation of any title to property by any conditional vendor to any property which may be affixed to the Premises so as to become a part thereof (excluding trade fixtures and trade machinery and equipment used in Tenant's business), wholly or in any portion, without material injury to the Premises. Landlord hereby states that the reservation of any such title by any conditional vendor or similar party shall be null and void.

**SECTION 45: OUTSIDE STORAGE:**

Tenant shall not store any goods, other than temporarily in connection with the delivery of any item, outside of the Premises or any place in the Center.

[J:\528041\019\24mhoh37.W51]
[07/08/93 10:16am; PRICE_C]

## SECTION 46: CERTIFICATE OF OCCUPANCY:

If required, Tenant shall obtain a Certificate of Occupancy permitting the use of the Premises by Tenant in accordance with the terms of this Lease, provided that Landlord shall cooperate fully with Tenant in obtaining said Certificate of Occupancy.

## SECTION 47: HOLDING OVER:

If Tenant shall hold over, with or without Landlord's consent, after the Term, then such holding over shall be constituted as a tenancy from month to month, subject to all of the provisions, conditions and obligations of this Lease, except that the Basic Rent shall be double the Basic Rent for the last month of the Term.

## SECTION 48: CONSENTS TO DEFAULTS:

No consent or waiver, express or implied, by Landlord, to or of any breach or default in the performance by Tenant of Tenant's obligations hereunder shall be deemed or construed to be a consent or waiver to or of any other breach or default in the performance by Tenant of the same or any other obligations of Tenant hereunder. Failure on the part of Landlord to complain of any act or failure to act of Tenant or to declare Tenant in default, irrespective of how long such act or failure continues, shall not constitute a waiver by Landlord of its rights hereunder.

## SECTION 49: INTEREST ON DEFAULT:

In the event Tenant fails to pay Rent when due, or fails, after notice, to take any action required of it under this Lease, which action is then taken by Landlord, Tenant shall pay to Landlord interest at the rate of twenty-four (24%) per cent per annum (the "Default Rate") on the Rent or monies expended by Landlord to cure any default of Tenant, which sum is agreed to be just and reasonable compensation to Landlord for Tenant's failure to pay the amount due and for Landlord not having the funds to otherwise invest, said interest to run from the date the same becomes due from Tenant until the date of payment. In the event that said interest rate is not allowable by law, then the

-28-

interest to be paid shall be the highest rate allowable by law.
No interest shall be due provided Rent is paid on or before the
10th day of the month.

### SECTION 50: FINANCIAL STATEMENTS:

Tenant shall, if required by Landlord's mortgagee or any
future mortgagee, or prospective mortgagee or prospective
purchaser, submit to Landlord, any prospective mortgagee or
purchaser, without cost to Landlord, a copy of Tenant's financial
statement which shall be considered "confidential" by the
recipient. Tenant shall also, without cost to Landlord, submit
to any prospective mortgagee or purchaser such prior statements
as it may have, as and when required by Landlord or Landlord's
mortgagee or prospective mortgagee or prospective purchaser.

### SECTION 51: TABLE OF CONTENTS AND CAPTIONS:

The Table of Contents, captions or notes in the margin of
this Lease are inserted only as a matter of convenience and in no
way to define, limit or describe the scope or intent of this
Lease, or the terms, conditions and provisions hereof, nor as
affecting the meaning of the text of any article or section
hereof in any way.

### SECTION 52: BROKER:

Landlord agrees to pay, pursuant to a separate agreement,
all brokerage commissions payable in connection with the
negotiations for, and execution of, this Lease. Tenant and
Landlord warrant to each other that they have not dealt with any
real estate broker except R.J. Brunelli & Co. in connection with
this Lease. In the event of any misrepresentation by either
Landlord or Tenant, each party agrees to hold the other harmless,
including any costs, interest and legal fees.

### SECTION 53: NO ORAL CHANGES:

(a) There are no oral agreements between Landlord and
Tenant and this Lease supersedes and cancels any and all previous
negotiations, arrangements, letters of intent, lease proposals,
brochures, agreements, representations, promises, warranties and
undertakings between Landlord and Tenant with respect to the

-29-

subject matter hereof and none thereof shall be used to interpret or construe this Lease.

(b)    This Lease, including the Schedules hereto and any addenda hereto, sets forth all of the covenants, promises, agreements, conditions and undertakings between Landlord and Tenant concerning the Premises and the Center.    No alteration, amendment, change or addition to this Lease shall be binding upon Landlord or Tenant unless reduced to writing, signed by them and mutually delivered between them.

## SECTION 54:    MERCHANT'S ASSOCIATION:

In the event that a Merchants' Association (the "Association") is established, Tenant shall have the option to become a member thereof, and if Tenant so elects to become a member, then Tenant agrees to abide by the By-Laws of the Association, and shall pay its Proportionate Share of any dues, assessments, or costs incurred by the Association.

## SECTION 55:    INTERPRETATION:

The laws of the State of New Jersey shall govern the validity, performance and enforcement of this Lease.    The invalidity or unenforceability of any provision hereof shall not affect or impair any other provision.

## SECTION 56:    ACCORD AND SATISFACTION:

No payment by Tenant or receipt by Landlord of lesser amount than the Rent stipulated in this Lease shall be deemed to be other than on account of the earliest stipulated Rent, nor shall any endorsement or statement on any check or any letter accompanying any check or payment as rent be deemed an accord and satisfaction, and Landlord may accept such check or payment without prejudice to Landlord's right to recover the balance of such rent or pursue any other remedy provided in this Lease by law.

## SECTION 57:    CONSENTS:

With respect to any provision of this Lease which requires that Landlord shall not unreasonably withhold or unreasonably delay any consent or approval, Tenant shall not make or assert

[J:\528041\019\24mhoh37.W51]
[07/08/93 10:16am; PRICE_C]

any claim for, and Tenant hereby waives any claim for money damages. Tenant shall not claim any money damages by way of setoff, counterclaim or defense, based upon any claim or assertion by Tenant that Landlord has unreasonably withheld or unreasonably delayed any consent or approval. Tenant's sole and exclusive remedy shall be an action or proceeding for specific performance, injunction or declaratory judgment. Notwithstanding anything to the contrary, Tenant may make or assert a claim for actual money damages (but not punitive or special damages) incurred as a result of Landlord's exercising its discretion hereunder in an arbitrary and capricious manner.

**SECTION 58: MORTGAGEE PROTECTION CLAUSE:**

Tenant agrees to give all mortgagees and/or trust deed holders, by certified mail, a copy of any notice of default served on Landlord, provided that prior to such notice Tenant has been notified, in writing (by way of notice of assignment of rents and leases or otherwise), of the name and address of such mortgagees and/or trust deed holders. The mortgagees and/or trust deed holders shall have the same time within which to cure such default as is given to Landlord under this Lease.

**SECTION 59: WATER, STANDBY SPRINKLER, SPRINKLER ALARM AND SEWER (IF ANY) CHARGES:**

Tenant shall pay as Additional Rent (and not as part of Operating Costs) its Proportionate Share of water, standby sprinkler, sprinkler alarm, and sewer (if any) charges for the entire Center. Tenant shall pay to Landlord in monthly installments on the first day of each month its estimated Proportionate Share of such charges. Upon receipt of a final bill or bills for such charges for each year of the Term, each party agrees to pay the other on demand, such amount as may be necessary to adjust the amount paid hereunder to the actual amount paid to the entity providing such service and/or utility; provided, however, should Landlord owe Tenant, such amount may be treated as a credit to Tenant's next succeeding payments for such

[J:\528041\019\24mhoh37.W51]
[07/08/93 10:16am; PRICE_C]

charges. The monthly installments of such charges shall be
increased or decreased on account of such final bill or bills.

**SECTION 60: BUSINESS HOURS:**

Tenant agrees to conduct its business and remain open Monday
to Friday, 10:00 a.m. to 9:00 p.m.; Saturday, 10:00 a.m. to 5:30
p.m. and Sundays, 11:00 a.m. to 5:00 p.m., except that Tenant may
close on July 4, New Year's Day, Thanksgiving Day, Christmas Day,
Mother's Day and Easter Sunday. In the event that Tenant does
not remain open as aforesaid it shall pay Landlord, as Additional
Rent, $250.00 per day for each day or part thereof that it is
closed, which sum is agreed to be just and reasonable
compensation to Landlord for Tenant's failure to so open the
Premises for business. Tenant need not remain open because of
severe inclement weather. If Tenant requires the lights for the
Center to remain on after 1:00 a.m. any morning, then Tenant
shall reimburse Landlord on demand, as Additional Rent, for the
cost thereof (or, if another tenant makes such request, then
Tenant shall pay an equitably pro-rated portion of the cost
thereof).

**SECTION 61: NEGOTIATED LEASE:**

This is a negotiated Lease. This Lease shall not be
construed against Landlord by reason of it being prepared by
Landlord's attorneys.

**SECTION 62: CENTER:**

(a)  The Center shall include the parcel(s) of land and
improvements generally depicted as the Center whether owned in
fee or ground leased by Landlord. Landlord reserves the right to
add to or sever the ownership of or title to any portion of the
Center at any time. It is agreed that the depiction of the
Center does not constitute a representation, covenant or warranty
of any kind by Landlord. Landlord reserves the right to change
the size and dimensions of the Center, the number and location of
buildings, building dimensions, the number of floors in any of
the buildings, store dimensions, identity and type of other

[J:\528041\019\24mhoh37.W51]
[07/08/93 10:16am; PRICE_C]

stores and tenancies, and, as provided in **Section 10**, the common areas.

(b)  In accordance with paragraph (a) above, Landlord specifically reserves the right to include any additional buildings and improvements which may be erected adjacent to the Center as part of the Center for all purposes under this Lease.

(c)  In the event that Landlord exercises its rights pursuant to paragraph (a) or (b) above, Operating Costs shall be determined pursuant to **Section 8** hereof on the basis of the redefined Center.

### SECTION 63: CONTROL OF TENANT:

If Tenant or any Guarantor under this Lease is a corporation and if at any time during the Term of this Lease such corporation's shares of capital stock shall be transferred to a related entity or corporation, Tenant shall so notify Landlord. Landlord may terminate this Lease if Tenant or any Guarantor under this Lease is a corporation or partnership and the interest of any corporation or partner in Tenant or any Guarantor under this Lease in excess of fifty (50%) percent is transferred to a non-related entity or corporation, and Tenant shall be and remain liable to Landlord for all damages and losses suffered by it in the same manner as if this Lease were terminated for any other default of Tenant; provided, however, that the foregoing shall not apply if the transferee is a creditworthy entity or corporation.

### SECTION 64: PROCESSING CHARGE:

Tenant agrees to reimburse Landlord for reasonable attorneys' fees and accounting fees incurred by Landlord in connection with the processing and documentation of any assignment, subletting, license, concession, creation of a security interest, granting of a collateral assignment, change of ownership or other transfer required by Tenant for which Landlord's consent is required or sought, it being agreed that Landlord shall not be required to take any action thereon until Landlord is first paid such amount.

[J:\528041\019\24mhoh37.W51]
[07/08/93 10:16am; PRICE_C]

**SECTION 65: RIGHT OF FIRST REFUSAL:**

In the event that any or all of Tenant's interest in the Premises and/or this Lease is transferred by operation of law to any trustee, receiver, or other representative or agent of Tenant, or to Tenant as a debtor in possession, and subsequently any or all of Tenant's interest in the Premises and/or this Lease is offered or to be offered by Tenant or any trustee, receiver, or other representative or agent of Tenant as to its estate or property (such person, firm or entity being hereinafter referred to as the "Grantor"), for assignment, conveyance, lease, or other disposition to a person, firm or entity other than Landlord (each such transaction being hereinafter referred to as a "Disposition"), it is agreed that Landlord has and shall have a right of first refusal to purchase, take, or otherwise acquire, the same upon the same terms and conditions as the Grantor thereof shall accept upon such Disposition to such other person, firm, or entity; and as to each such Disposition the Grantor shall give written notice to Landlord in reasonable detail of all of the terms and conditions of such Disposition within twenty (20) days next following its determination to accept the same but prior to accepting the same, and Grantor shall not make the Disposition until and unless Landlord has failed or refused to accept such right of first refusal as to the Disposition, as set forth herein.

Landlord shall have sixty (60) days next following its receipt of the written notice as to such Disposition in which to exercise the option to acquire Tenant's interest by such Disposition, and the exercise of the option by Landlord shall be effected by written notice to that effect sent to the Grantor by certified or registered mail; but nothing herein shall require Landlord to accept a particular Disposition or any Disposition, nor does the rejection of any one such offer of first refusal constitute a waiver or release of the obligation of the Grantor to submit other offers hereunder to Landlord. In the event Landlord accepts such offer of first refusal, the transaction

-34-

shall be consummated pursuant to the terms and conditions of the
Disposition described in the notice to Landlord.  In the event
Landlord rejects such offer of first refusal, Grantor may
consummate the Disposition with such other person, firm, or
entity; but any decrease in price of more than two (2%) percent
of the price sought from Landlord or any change in the terms of
payment for such Disposition shall constitute a new transaction
requiring a further option of first refusal to be given to
Landlord hereunder. ·

**SECTION 66: HAZARDOUS SUBSTANCES:**

(a)  In the event that any hazardous, toxic or nuclear
substances and wastes are used at the Premises, Tenant shall
keep, maintain and dispose of them as required by law.  At the
end of the Term or any extensions thereof, Tenant shall comply
with all environmental laws including, but not limited to,
Environmental Clean-Up Responsibility Act, N.J.S.A. 13:1K-6, et
seq., resulting from Tenant's use and occupancy of the Premises.
At least thirty (30) days prior to the end of the Term of this
Lease, or any extensions thereof, or the vacation of the Premises
by Tenant for any reason, Tenant shall deliver to Landlord
written proof from the proper governmental authorities that all
environmental laws have been complied with or are not applicable
to the Premises.  During the Term, Tenant shall deliver to
Landlord, ten (10) days after written demand, any information,
certificate or similar document required by Landlord to comply
with any environmental or similar laws.  Tenant's SIC No.
is _____.

(b)  Tenant shall provide all information within Tenant's
control requested by Landlord or the Industrial Site Evaluation
Element or its successor ("Element") of the New Jersey Department
of Environmental Protection or its successor ("NJDEP") for
preparation of a non-applicability affidavit or other type of
submission, should Landlord or NJDEP so request, and Tenant shall
promptly execute such affidavit or submission should the

-35-

information contained in the affidavit or submission be found by Tenant to be complete and accurate.

(c)   If ECRA compliance becomes necessary at the Premises due to any action or non-action on the part of Landlord, including but not limited to Landlord's execution of a sale agreement for the Center or the Premises, any change in ownership of the Center or the Premises, initiation of bankruptcy proceedings, Landlord's financial reorganization or sale of the controlling share of Landlord's assets, then Landlord shall comply with ECRA and all requirements of the Element and NJDEP at Landlord's own expense, except for the actual clean up costs resulting directly from Tenant's use and occupancy of the Premises, which shall be borne by Tenant.

(d)   This Section 66 shall survive the expiration or earlier termination of this Lease.

**SECTION 67:   MODIFICATIONS REQUESTED BY MORTGAGEE:**

In the event that a prospective mortgagee of the Center shall request a change in the language of the terms of this Lease, or the execution of any document in connection therewith, Tenant agrees to make such change or execute such document provided the same shall not increase Tenant's obligations or liabilities under this Lease.

**SECTION 68:    REIMBURSEMENT OF LEGAL EXPENSES:**

In case Landlord shall, without fault on its part, be made a party to any litigation commenced by or against Tenant, Tenant shall pay on written demand from Landlord, as Additional Rent hereunder, all costs, including reasonable attorney's fees incurred by or against Landlord in connection with such litigation.   Tenant shall also pay on written demand from Landlord, as Additional Rent hereunder, all costs and reasonable attorney's fees incurred by or against Landlord in enforcing any of the covenants, terms, and provisions of this Lease, or in terminating this Lease by reason of Tenant's default.   Landlord shall have the right to charge a legal fee no less than One Hundred ($100.00) Dollars for each and every instance where

[J:\528041\019\24mhoh37.W51]
[07/08/93 10:16am; PRICE_C]

Landlord requires the use of its attorneys to enforce any of the covenants, terms and provisions of this Lease.

**SECTION 69: RENEWAL OPTION:**

Tenant is hereby granted one (1) option to renew this Lease, upon following the terms and conditions:

(a)  At the time of the exercise of the option to renew and at the time of the said renewal, Tenant shall not be in default in accordance with the terms and provisions of this Lease, and shall be in possession of the Premises pursuant to this Lease.

(b)  Notice of the exercise of the Option shall be sent to Landlord, in writing, at least twelve (12) months before the expiration of the Term.

(c)  The Renewal Term shall be for the term of five (5) years to commence at the expiration of the Term, and all of the terms and conditions of this Lease, other than the Basic Rent, shall apply during the Renewal Term.

(d)  The Basic Rent during the Renewal Term shall be the sum of One Million Two Hundred Ninety Thousand Three Hundred ($1,290,300.00) Dollars which shall be payable in monthly installments as set forth on Schedule "C" in the manner provided for in Section 2 of this Lease.

**SECTION 70: OPTION TO LEASE ADJOINING SPACE:**

Tenant is hereby granted the option to lease approximately 5,000 square feet of space adjacent to the Premises presently occupied by Pearle Vision Center and so designated on Schedule "A" in its "AS-IS" condition, which option is to be exercised in writing to Landlord on or before the sixtieth (60th) day following written notice from Landlord to Tenant that such space is available for leasing, TIME BEING OF THE ESSENCE. In the event Tenant so exercises such option, then, immediately commencing on the day Landlord delivers possession of said space to Tenant, the Premises shall be deemed to include such additional space, so that the Premises contain approximately 15,200 square feet of space, the Basic Rent shall be adjusted

[J:\528041\019\24mhoh37.W51]
[07/08/93 10:16am; PRICE_C]

pursuant to the provisions of Schedule "C", and Tenant's

Proportionate Share shall be increased to 16.8%.

SECTION 71:  CONTINGENCIES:

Notwithstanding anything to the contrary, the effectiveness

and validity of this Lease is hereby conditioned and made

contingent upon Tenant obtaining a construction permit for the

Tenant Alteration, ~~and~~ all necessary licenses and permits to run

the food portion of its business, no later than sixty (60) days *Ouilla

following execution of this Lease.

If any of the contingencies above is not satisfied, Landlord

or Tenant may terminate this Lease by written notice to the other

party; in which event Landlord shall return to Tenant all monies

deposited hereunder, without interest, and the parties shall have

no further rights or obligations with respect to this Lease; ** Oul/le

Landlord and Tenant acknowledges that they ~~have retained~~ intend to Oul/le

~~Irwin Pfeiffer to~~ simultaneously submit the applications for and

obtain the necessary construction permits for the Landlord

Alteration and the Tenant Alteration.  In the event Tenant

commences the Tenant Alteration, then (a) Tenant shall be deemed

to have waived all contingencies in the first paragraph of this

Section 71, and (b) Landlord will expeditiously commence the

Landlord Alteration.  As part of Tenant's application (but not as

a contingency hereunder), Tenant shall seek approval from the

Township of East Brunswick for permission to use the front of the

Premises for loading and unloading of deliveries.  If such

permission is denied, Landlord shall seek permission from Loew's

to use that area designated on Schedule "A" as "Loading A" for

such purposes.  If that permission is denied, then Landlord shall

Oul/le

* and satisfactory proof that all utilities will be available
to the Premises in sufficient amounts on or before the
Commencement Date, all

** provided, however, that if any contingency is not so satisfied,
Landlord, at its sole option, may (a) extend the date for satisfying
same an additional thirty (30) days, or (b) undertake itself,
at Tenant's expense, the work of satisfying such contingency Oul/
or contingencies, and if Landlord elects either (a) or (b)
above, then Tenant shall not -38- have the
right to terminate this Lease until said thirty (30) day
period has expired (and in no event may Tenant then...)

[J:\528041\019\24mhoh37.W51]
[07/08/93 10:16am; PRICE_C]

lease to Tenant, for the remainder of the Term, that area designated on Schedule "A" as "Loading B" for such purposes, at a gross annual rent of $3,000.00 for the first year of the Term, increased annually thereafter on a compounded basis by three (3%) percent, and payable in equal monthly installments on the first day of each month during the Term.

**IN WITNESS WHEREOF**, the parties have executed these presents the day and year first above written.

WITNESS:

_____

WITNESS:

_____

_____

_____

LEON HARARY, E.B., Landlord

By _____ Partner

_____
JAMES NG, Tenant

_____
CINDY NG, Tenant

_____
DAVID KAU, Tenant

[J:\528041\019\24mhoh37.W51]
[07/08/93 10:16am; PRICE_C]

## SCHEDULE "C"

## Payment of Rent

| Year(s) | Annual Rent | Monthly Installment |
|---------|-------------|---------------------|
| 1-2 | $142,800.00 | $11,900.00 |
| 3-4 | $158,100.00 | $13,175.00 |
| 5-6 | $168,300.00 | $14,025.00 |
| 7-8 | $178,500.00 | $14,875.00 |
| 9-10 | $188,700.00 | $15,725.00 |
| 11-12 | $209,100.00 | $17,425.00 |
| 13-14 | $224,400.00 | $18,700.00 |
| 15 | $239,700.00 | $19,975.00 |
| 16 (renewal term) | $239,700.00 | $19,975.00 |
| 17-18 (renewal term) | $255,000.00 | $21,250.00 |
| 19-20 (renewal term) | $270,300.00 | $22,525.00 |

Notwithstanding anything to the contrary, the annual rents set forth above are based on an assumed square footage for the Premises of 10,200. If Landlord's architect certifies that the square footage is other than 10,200, then for all purposes of this Lease, to include the calculation of Additional Rent and Tenant's Proportionate Share of Operating Costs, the square footage of the Premises shall be adjusted accordingly, and the annual rent adjusted as follows:

| Year(s) | Dollar Per Square Foot Rent |
|---------|------------------------------|
| 1-2 | $14.00 |
| 3-4 | $15.50 |
| 5-6 | $16.50 |
| 7-8 | $17.50 |
| 9-10 | $18.50 |
| 11-12 | $20.50 |
| 13-14 | $22.00 |
| 15 | $23.50 |
| 16 (renewal term) | $23.50 |
| 17-18 (renewal term) | $25.00 |
| 19-20 (renewal term) | $26.50 |

## SCHEDULE "D"

### Landlord Alteration

The former United Outlet space to be delivered "As-Is", except for the removal of trade fixtures. The existing wall separating the former United Outlet space from the hallway to remain, except for openings as agreed upon between Landlord and Tenant. With respect to the 2,200 square foot hallway portion of the Premises:

1) Install heating ventilating and air-conditioning comparable with that in the former United Outlet space.

2) Install electrical outlets required by applicable code.

3) Install a drop ceiling (including lights) comparable with that in the former United Outlet space and as close as possible to the same height as that in the former United Outlet space.

4) Sheet rock and spackle.

[J:\528041\019\24mhoh37.W51]
[07/08/93 10:16am; PRICE_C]

## SCHEDULE "E"

### Tenant Alteration

Tenant shall demolish and remove any interior non-structural partitions, and shall construct, fixture and fully stock a specialty grocery store. Landlord acknowledges that such work shall include the construction and installation of pipes, conduits and drains required in order to conduct the food portion of Tenant's business. Tenant may also alter the facade in front of the 2,200 square foot portion of the Premises presently constituting a hallway in order to match the facade in front of the 8,000 square foot portion of the Premises constituting the former United Outlet Store, in which event Tenant shall receive a credit against the first installment of Basic Rent due hereunder (following the payment described in Section 30(b) above) equal to fifty (50%) percent of the cost thereof, as reasonably evidenced by copies of invoices submitted from Tenant to Landlord, which credit shall in no event exceed Three Thousand ($3,000.00) Dollars.

## Business Plan

The proposed Asian Specialty Grocery Food and Service Center consists of an Asian specialty grocery food store and a service center. The grocery food store provides high quality, fresh food items, vegetables, fish, meat and a health line food product to customers for the Middlesex and Monmouth County customers.

## 1.1 Service Center

The service center will conveniently provide the following services to address the needs for special group of customers:

- o    Asian Newspapers, magazines, books, music and video tapes, and film development.

- o    Accounting and legal services especially needed for the customers who feel comfortable to discuss their needs with those who speak their own language.

- o    Beauty salon (it is a specialty due to the hair style and its culture)

- o    Other services that will be demanded by our customers.

## 1.2 Grocery Store Products

Except dry or can goods, most fresh food items will be transported daily from our wholesalers, so that the quality and freshness will be guaranteed.

### 1.2.1    Fresh Daily Products

- o    Meat, beef, and some porks

- o    Poultry, American and Chinese breed chicken

- o    Barbecue and Cooked Food (Deli Type Business); Barbecue rib, roasted chicken and duck and other items

- o    Seafood; Fresh fish and shrimps

- o    Vegetable; Seven most popular Chinese and American vegetables

- o    Bean Products; Bean Sprouts, bean curds

- o    Fresh fruits; between six to eight most popular fruits

- o    Salad; Daily fresh vegetable and fruit salad

- o    Other products that will fit our business

### 1.2.2    Dry/Can Products

- o    High quality goods that would not be available from regular supermarkets

- o    Health goods which have high nutrition, good taste, with low calorie and fats.

## 1.3   Quality of the Service

Good services, high quality, and low cost will be the trade mark of our business. This trade mark enable us to success in Hong King, and we believe customers are also demanding here just as people elsewhere.

# SCHEDULE "B"

## Certificate of Commencement

Pursuant to the provisions of Section 1 of the Lease dated July ___, 1993, Landlord and Tenant, intending to be legally bound, hereby agree that the Term of the Lease shall end on the 22nd day of November, 2008, unless sooner terminated or extended as therein provided.

**IN WITNESS WHEREOF**, the parties have executed these presents the day and year first above written.

WITNESS:

LEON HARARY, E.B., Landlord

By _____, Partner

WITNESS:

_____
JAMES NG, Tenant  *Park's Market Center Corp.*

_____
CINDY NG, Tenant

_____
DAVID KAU, Tenant