# EXHIBIT C

L E A S E

Between

HARARY GROUP,
a Partnership of the State of New Jersey,

Landlord

and

HONG KONG SUPERMARKET OF EAST BRUNSWICK, INC.,
a Corporation of the State of New Jersey

Tenant

Dated:  September 15, 2011

# TABLE OF CONTENTS

SECTION 1.  TERM.

SECTION 2.  BASIC RENT.

SECTION 3.  PROPORTIONATE SHARE.

SECTION 5.  INTENTIONALLY OMITTED.

SECTION 6.  INTENTIONALLY OMITTED.

SECTION 7.  INTENTIONALLY OMITTED.

SECTION 8.  OPERATING COSTS.

SECTION 9.  COMMON AREAS.

SECTION 10.  COMMENCEMENT OF TERM.

SECTION 11.  SECURITY DEPOSIT.

SECTION 12.  NET LEASE.

SECTION 13.  PURPOSE, TRADE NAME, RESTRICTIONS.

SECTION 14.  LANDLORD'S OBLIGATIONS.

SECTION 15.  CONDITION OF PREMISES; REPAIRS.

SECTION 16.  ALTERATIONS.

SECTION 17.  COMPLIANCE WITH RULES AND REGULATIONS; COMPLIANCE WITH LAW.

SECTION 18.  DAMAGES TO CENTER; WAIVER OF SUBROGATION.

SECTION 19.  EMINENT DOMAIN; CONDEMNATION.

SECTION 20.  ASSIGNMENT, SUBLETTING.

SECTION 21.  INDEMNITY AND TENANT'S INSURANCE.

SECTION 22.  FIRE INSURANCE; INABILITY TO OBTAIN.

SECTION 23.  RIGHT TO INSPECT AND EXHIBIT.

SECTION 24.  NO LIABILITY OF LANDLORD.

SECTION 25.  LANDLORD'S EXCULPATION.

SECTION 26.  UTILITIES, SERVICES, ETC., AND HVAC.

SECTION 27.  INSOLVENCY OF TENANT.

SECTION 28.  DEFAULTS.

SECTION 29.  REAL ESTATE TAXES; OTHER TAXES.

SECTION 30.  SIGNS.

SECTION 31.  OUTSIDE STORAGE.

SECTION 32. FINANCIAL STATEMENTS.

SECTION 33. INTENTIONALLY OMITTED.

SECTION 34. SUBORDINATION; PRIORITY OF FEE MORTGAGES.

SECTION 35. MORTGAGEE PROTECTION CLAUSE.

SECTION 36: WATER, STANDBY SPRINKLER, SPRINKLER
                ALARM AND SEWER (IF ANY) CHARGES.

SECTION 37. BUSINESS HOURS.

SECTION 38. CENTER.

SECTION 39. CONTROL OF TENANT.

SECTION 40. PROCESSING CHARGE.

SECTION 41. RIGHT OF FIRST REFUSAL.

SECTION 42: ENVIRONMENTAL MATTERS.

SECTION 43. MODIFICATIONS REQUESTED BY MORTGAGEE.

SECTION 44. QUIET ENJOYMENT.

SECTION 45. ESTOPPEL CERTIFICATE.

SECTION 46. HOLDING OVER.

SECTION 47. NO WAIVER; ENTIRE AGREEMENT; NO SURRENDER.

SECTION 48. REIMBURSEMENT OF LEGAL EXPENSES.

SECTION 49. BROKER.

SECTION 50. OPTIONS TO RENEW.

SECTION 51. EXECUTION BY LANDLORD.

SECTION 52. RECORDATION.

SECTION 53. NOTICES.

SECTION 54. PERSONS BOUND.

SECTION 55. PARTIAL INVALIDITY.

SECTION 56. CONSENTS.

SECTION 57. LANDLORD'S LIEN

SECTION 58. MISCELLANEOUS.

SECTION 59. GUARANTY.

SECTION 60. TERMINATION OF PRIOR LEASE.

EXHIBITS:

SCHEDULE A:  THE PREMISES

SCHEDULE B:  RENT SCHEDULE

SCHEDULE C:  GUARANTY

SCHEDULE D:  EXCLUSIVE USE PROVISIONS

SCHEDULE E:  INTENTIONALLY OMITTED

SCHEDULE F:  TENANT'S BUSINESS PLAN

THIS AGREEMENT, entered into as of the 15th day of September, 2011, between HARARY GROUP, a New Jersey partnership, having offices located at 275 Route 18, East Brunswick, New Jersey 08816 (hereinafter referred to as "Landlord") and HONG KONG SUPERMARKET OF EAST BRUNSWICK, INC., a New Jersey corporation, having offices located at 275 Route 18, East Brunswick, New Jersey 08816, New Jersey (hereinafter referred to as "Tenant").

WITNESSETH:

PREMISES: The Landlord hereby demises and leases unto the Tenant and the Tenant hereby hires and takes from Landlord, for the term and upon the rentals, terms and conditions hereinafter specified, the premises shown on Schedule "A" (the "Premises") consisting of approximately 53,800 square feet, which Premises are a part of a shopping center (the "Center") known as the Miracle Mall, located at 275 Route 18, in the Township of East Brunswick, County of Middlesex and State of New Jersey, and also includes a right of access to the Premises and all public areas of the Center together with the parking spaces in the parking area in common with other tenants of the Center.

SECTION 1. TERM.

The Premises are leased to the Tenant for a term of fifteen (15) years (the "Term"), commencing on October 1, 2011, and ending at midnight on September 30, 2026, subject to the terms of this Lease. The actual commencement date shall be determined in accordance with the provisions of Section 10 of this Lease and the expiration date of this Lease shall be determined accordingly.

SECTION 2. BASIC RENT.

(a) Basic Rent shall be payable in monthly installments, in advance, on the first day of each calendar month during the term of this Lease, except that a proportionately lesser sum may be paid for the first and last months of the term of this Lease if the Commencement Date is other than the first day of the month. The Basic Rent payable by Tenant to Landlord during the Term hereof shall be payable in monthly installments as set forth on Schedule B annexed hereto and made a part hereof.

Tenant currently occupies approximately 36,800 square feet of space in the Center pursuant to the terms of a Lease Agreement dated July, 1993 between Landlord and James Ng, Cindy Ng and David Kau and Park's Market Center Corp., which Lease Agreement was modified by Lease Modification Agreement between Landlord and Tenant dated as of July 1, 1997. This Lease is intended to include the 36,800 square feet currently occupied by Tenant (the "Existing Space"), together with the adjoining 17,000 square feet of space previously occupied by K&G Men's Warehouse (the "Additional Space"). Landlord and Tenant agree that until the earlier of (i) March 15, 2012 or (ii) the date Tenant opens for business in the Additional Space, Tenant shall only be required to pay Basic Rent and Additional Rent for the Existing Space in monthly installments as set forth in the July 1, 1997 Lease Modification Agreement. Thereafter, commencing on the earlier of March 1, 2012 or the date Tenant opens for business in the Additional Space (the "Entire Premises Rent Commencement Date"), and for the balance of the Term, Tenant shall pay Basic Rent for the entire space Leased hereunder as set forth in Schedule B. If the Entire Premises Rent Commencement Date is other than the first day of the month, the Rent for such month shall be adjusted proportionately between the Rent due for the Existing Space and the Rent due for the entire space as of the Entire Premises Rent Commencement Date.

Landlord further agrees that in the event Tenant does not obtain the building permits required for its construction of the Initial Tenant Improvements (as defined in Section 16(a) of this Lease) on or before November 1, 2011, the Entire Premises Rent Commencement Date shall be extended to the earlier of (i) April 1, 2012 or (ii) the date Tenant opens for business in the Additional Space. Tenant agrees to promptly submit its applications for the building permits and to diligently prosecute such applications.

(b) Tenant shall pay Basic Rent and any Additional Rent required to be paid under this Lease (collectively referred to in this Lease as "Rent") in lawful money of the United States to Landlord at Landlord's address set forth above, or at such other place as Landlord may designate

2

in writing, without demand and without counterclaim, deduction or setoff, except as otherwise provided herein.

(c) If Tenant shall fail to pay, within ten (10) days of when the same is due and payable, any Basic Rent or any Additional Rent, Tenant shall, upon demand, pay to Landlord a late charge equal to ten (10%) percent per annum on the past due amount from the original due date until paid in full.

## SECTION 3. PROPORTIONATE SHARE.

(a) For purposes of this Lease, Landlord and Tenant agree that the Premises constitute 52.32% of the Center, based upon the square footage of the Premises (53,800 square feet) and the rentable square footage of the Center (102,834 square feet). The Tenant's Proportionate Share of all expenses and costs of operation of the Center and Real Estate Taxes shall be deemed to be 52.32%, subject to adjustment in the event there is an increase in the rental space constructed by Landlord or the Tenant leases more space in the Center. Landlord shall contemporaneously with the execution of this lease provide Tenant with a site plan for the Center.

Notwithstanding the above, Landlord agrees that until the Entire Premises Rent Commencement Date, Tenant's Proportionate Share of all expenses and costs of operation of the Center and Real Estate Taxes shall be 35.74% (based on the square footage of the Existing Space only). Thereafter, commencing on the Entire Premises Rent Commencement Date and for the balance of the Term, Tenant's Proportionate Share shall be 52.32%.

(b) Within sixty (60) days after the signing of this Lease, Landlord or Tenant shall have the right to have their architect verify the exact square footage of the Premises, measured from the outer line of the outside walls to the center line of the demising party walls, all of which form the perimeter of the Premises. If any such measurement varies from that set forth in this Lease (whether the measured square footage is more or less than that set forth in this Lease), the measuring party shall provide written notice of such variance to the other party, and such calculation shall be subject to verification by the other party. Landlord and Tenant shall thereafter cooperate to establish the exact square footage of the Premises, and such determination shall be used to recalculate the Basic Rent, Tenant's Proportionate Share and any Additional Rent due under this Lease. The parties agree that any such adjustment shall be made only with respect to the Term of this Lease (and any renewal terms), and shall not apply to any Rent paid by Tenant for the Existing Space pursuant to the July, 1993 Lease, as subsequently amended in July, 1997.

## SECTION 4. ADDITIONAL RENT.

(a) Tenant shall pay as Additional Rent its Proportionate Share of "Operating Costs" as defined in Section 8 of this Lease. Tenant shall pay it's Proportionate Share of Operating Costs in monthly installments, in advance, on the first day of each month during the term, based upon Landlord's estimate of Operating Costs for the applicable calendar year. At any time, and from time to time, Landlord shall advise Tenant in writing of Tenant's Proportionate Share of Operating Costs and Tenant shall pay the same in equal monthly installments, such new rates being applied to the months for which the rental shall have already been paid for the calendar year, as well as to the unexpired months of such calendar year, with the adjustment for the expired months to be made at the payment of the next succeeding monthly rental payment, all subject to final adjustment at the expiration of each calendar year as hereinafter provided.

(b) Landlord shall submit an invoice to Tenant within one hundred twenty (120) days after the end of each calendar year during the Term with a statement of the actual Operating Costs; if Tenant's Proportionate Share of Operating Costs exceeds the monthly sums provided above, Tenant shall forthwith (but not later than the first day of the next month) make payment to the Landlord of the amount in excess of the payments previously made by Tenant for such calendar year, and if Tenant's Proportionate Share of Operating Costs is less than the monthly sums provided above, Tenant shall receive a credit for the difference against the next installments of Rent due and owing. If Tenant is entitled to a credit for excess payment of its Proportionate Share of Operating Costs after the last year of the term, Landlord shall forward said amount to Tenant within twenty (20) days after the reasonable determination by Landlord of the amount due to Tenant. Tenant's monthly payment of its Proportionate Share of Operating Costs shall be increased or decreased to coincide with any increase or decrease described above.

3

(c) Within one hundred twenty (120) days after Tenant's receipt of Landlord's year end statement of Operating Costs, Tenant (or its accountant and/or employees), upon reasonable advance written notice to Landlord, may examine the books and records of Landlord, at Landlord's place of business, regarding any costs pertaining to Operating Costs for the prior twelve (12) month period, and may make copies thereof of information which is not confidential. If, as a result of such examination, Landlord and Tenant agree that Tenant's payment of its share of Operating Costs exceeds the amount that Tenant should have been billed, then Tenant shall be entitled to a credit for such amount against the Rent next coming due. If Landlord and Tenant are unable to agree upon the amount of Tenant's Proportionate Share of Operating Costs due for the applicable period, then Landlord and Tenant shall attempt to adjust such disagreement in good faith, and if they are unable to do so, such disagreement shall be subject to resolution by expedited arbitration in Middlesex County, New Jersey, in accordance with the rules of the American Arbitration Association. The determination of the arbitration shall be conclusive upon the parties, and the parties shall share equally the expenses of the arbitration.

(d) All sums of money or charges required to be paid by Tenant under this Lease (other than Basic Rent), whether or not the same be so designated, shall be deemed "Additional Rent". If such amounts or charges are not paid at the time provided in this Lease, they shall nevertheless, if not paid when due, be collectible as Additional Rent with the next installment of rent thereafter falling due hereunder, but nothing herein contained shall be deemed to suspend or delay the payment of any amount of money or charges as the same becomes due and payable hereunder, or limit any other remedy of the Landlord.

SECTION 5.  INTENTIONALLY OMITTED.

SECTION 6.  INTENTIONALLY OMITTED.

SECTION 7.  INTENTIONALLY OMITTED.

SECTION 8.  OPERATING COSTS.

(a) Operating Costs, for the purposes of this Lease, shall mean the aggregate of all expenses of operating the common areas of the Center and its appurtenances and shall include, but shall not be limited to, the following: all expenses for maintaining, operating and repairing the Center and its appurtenances, including the expenses of normal replacement of worn out equipment, facilities and installations; the cost of electricity, water, and other utilities; security, gardening and other landscaping; snow removal; common area garbage disposal costs; maintenance and repair of the parking lot areas, driveways and roof, fire insurance, liability insurance, rent insurance, real estate taxes as defined in Section 29 of this Lease; painting, supplies, sales or use taxes on supplies or services; wages, salaries, and fringe benefits of all employees engaged in the operation, maintenance and repair of the Center and its appurtenances; the charges of any independent contractor who performs or does any of the work of operating, maintaining, or repairing the Center and its appurtenances and any other expenses or charges of any nature whatsoever with respect to the maintenance, repair and operation of the Center, including an administrative charge (not to exceed 10% of Operating Costs), whether or not herein mentioned, which is in accordance with sound accounting and management principles generally accepted with respect to the operation of a first-class shopping center, and which is reasonable and customary in the geographic area in which the Center is located.

Operating Costs shall not include, however, executive salaries, leasing commissions, and costs of additional buildings, if any, for which the Landlord is responsible and depreciation, interest on and amortization of mortgages, franchise, income and other taxes based upon the income of Landlord, provided the same shall not have been levied as a substitute for real estate taxes, and shall not include any items otherwise constituting such expenses to the extent payment therefor is received from, or payable by, any other tenants of the Center, to the extent such items are for the particular benefit of one or more tenants of the Center and not for all tenants of the Center as a whole. In addition, Operating Costs shall not include items for which Landlord is reimbursed by its insurance coverage (exclusive of any applicable deductibles) or is otherwise compensated by any third party, nor shall Operating Costs include the cost and expense of the following items:

(i) costs attributable to repairing items to the extent the cost of repair is actually covered by warranties;

(ii) costs attributable to seeking and obtaining new tenants as well as retaining existing tenants, including, without limitation, advertising expenses, brokerage commissions, architectural, engineering and attorney's fees, and the cost of renovating and improving rental space or equipment in the Center for the benefit of a particular or prospective tenant;

(iii) costs attributable to disputing or enforcing leases or agreements affecting the Center, including, without limitation, attorneys' fees, court costs and other expenses;

(iv) repairs, replacements and restoration resulting from fire, other casualty or from the exercise of the right of eminent domain;

(v) capital costs, so characterized according to the Internal Revenue Code and applicable Regulations to the extent that they improve the Common Areas beyond their original condition or utility on the Commencement Date of this Lease, provided such costs shall be amortized over the longest useful life of the repair or improvement in accordance with the Internal Revenue Code and applicable Regulations, and Tenant shall pay its Proportionate Share of the amortized portion that falls within the Lease term.

SECTION 9. COMMON AREAS.

(a) Tenant and Tenant's agents, employees, licensees and invitees shall have the non-exclusive right, during the Term, to the reasonable use of the Common Areas, together with Landlord and other lessees of portions of the Center, their invitees, licensees, agents and employees. Landlord reserves the right to grant to the owners and lessees of other properties in the vicinity of the Center and to their invitees, licensees, agents and employees the right to use the driveways located in the Center together with lessees of the Center, and to grant easements and other rights therein for such purpose, provided that same do not materially interfere or otherwise materially diminish the use, occupation and enjoyment of the Premises, Common Areas and appurtenances thereto by the Tenant or its employees, invitees and guests.

In order to establish that the Center, and any portion thereof, is and will continue to remain private property, Landlord shall have the restricted right to close such portions of the Center owned or controlled by Landlord, to the general public, for such periods of time and to the extent necessary, in the reasonable opinion of Landlord's attorneys, to be legally sufficient to prevent dedication thereof, or the accrual of any right in any person or to the public therein. In connection therewith, Landlord may, in its discretion, seal off entrances to the Center, or any portion thereof, for periods of at least one (1) day in each calendar year, provided Landlord provides adequate ingress and egress to the Center during all such times. Landlord agrees that in exercising such right, Landlord shall use its best efforts to limit the closure to the shortest time period possible and with the least interference with Tenant's operations or business as possible. All common areas and other facilities in or about the Center provided by Landlord shall be subject to the exclusive control of Landlord. Landlord shall have the right to construct, maintain and operate lighting and other facilities on all said areas and improvements; to police same; to change the area, level, location and arrangement of parking areas and other facilities; to build multi-story parking facilities, to allow anyone designated by Landlord to use the parking facilities without charge and/or to close temporarily all or any portion of the parking areas and facilities to discourage non-customer parking; and to erect additional buildings, improvements and structures in the Common Areas including without limitation, the parking areas designated from time to time by Landlord. Landlord shall operate and maintain the Common Areas in such manner as Landlord in its discretion shall determine, and Landlord shall have full right and authority to employ and discharge all personnel with respect thereto. All Common Areas and facilities which Tenant may be permitted to use and occupy are to be used and occupied under a non-exclusive revocable license, and if such license be revoked or if the amount of such areas be changed or diminished, Landlord shall not be subject to any liability to Tenant, nor shall Tenant be entitled to any compensation or diminution or abatement of rent, nor shall revocation or diminution of such areas be deemed constructive or actual eviction.

SECTION 10. COMMENCEMENT OF TERM.

(a) The Commencement Date shall be October 1, 2011 (the " Commencement Date"), and the expiration date of the Term shall be September 30, 2026. Tenant agrees to accept possession of the Premises in their strictly "as is" condition. After the Commencement Date, Landlord and

Tenant, promptly upon the request of either of them, will execute and deliver to each other a certificate setting forth the Commencement Date.

## SECTION 11. SECURITY DEPOSIT.

Landlord is currently holding a security deposit of $42,500.00 pursuant to the terms of the lease for the Existing Space. The existing security deposit shall continue to be held by Landlord as security for the full and faithful performance by the Tenant of all the terms, covenants and conditions of this Lease upon the Tenant's part to be performed. The security deposit shall be returned to the Tenant without interest, after the expiration of the Term (including any renewal terms), provided that Tenant has fully and faithfully carried out all of said terms, covenants and conditions on Tenant's part to be performed. Landlord shall have the right to apply any part of the security deposit to cure any default of Tenant, and if Landlord does so, Tenant shall, within ten (10) days after written demand, deposit with Landlord the amount applied so that Landlord shall have the full deposit on hand at all times during the term of this Lease. In the event of a sale or lease of the Center, subject to this Lease, the Landlord shall thereupon be considered released by the Tenant from all liability for the return of the security deposit and the Tenant shall look to the new Landlord solely for the return thereof provided the new Landlord has assumed such obligation or had received a credit at closing of title for such security deposit. It is agreed that the foregoing shall apply to every transfer or assignment made of the security to a new Landlord. The security deposited under this Lease shall not be mortgaged, assigned or encumbered by Tenant without the written consent of the Landlord, and any attempt to do so shall be void. Landlord shall provide notice to Tenant of all such transfers of the security deposit within seven (7) days after said transfer. No trust relationship is created between Landlord and Tenant as to said Security Deposit, and Landlord shall not be required to segregate the security deposit.

## SECTION 12. NET LEASE.

This Lease is a net lease. The Basic Rent shall be absolutely net to Landlord so that except as expressly provided in this Lease, this Lease shall yield, net to Landlord, the Basic Rent during the Term.

## SECTION 13. PURPOSE, TRADE NAME, RESTRICTIONS.

(a) Tenant shall use and occupy the Premises as a food market and service center catering in general to the Asian population, substantially in accordance with the Business Plan annexed hereto as Schedule F, and all or a substantial portion of the Additional Space shall be used as an Asian cuisine restaurant, and for no other purpose. Landlord further agrees that Tenant may enter into subleases, license agreements or concession agreements to run a bakery (including the sale of coffee) and to run the non-food portions of Tenant's business catering to the Asian population, in accordance with the Business Plan, to also include a travel agency, and the sale and repair of telecommunications equipment limited to a kiosk location or similar small open space, without Landlord's prior consent, provided (i) the total floor area of such non-food portions of Tenant's business does not exceed 9000 square feet of space, (ii) the floor area of any particular non-food use does not exceed 2500 square feet of space, and (iii) the proposed non-food use does not conflict with any exclusive use provision of any existing lease of space in the Center, or of any lease existing at the time such non-food use is to commence. Tenant agrees that it shall not use the Premises for any purpose which would violate any exclusive use provision of any existing tenant of the Center as set forth in Schedule D hereof, or for use as a general tool, hardware and related merchandise retailer, or as a "Dollar Store" or discount or closeout store offering general merchandise for sale. Tenant agrees that not less than seventy percent (70%) of the floor area of the Premises shall be used for the sale, preparation and/or storage of food.

Tenant covenants and agrees to trade and do business under the name "Hong Kong Supermarket" in the Existing Space. Tenant agrees not to use or permit the Premises to be used for any purpose not described herein without the prior written consent of Landlord, which consent Landlord may withhold, in its sole discretion.

(b) (1) During the term of this Lease, Landlord agrees not to lease any space in the Center to any tenant or otherwise permit the occupancy, subtenancy or assignment of or to any tenant (i) whose use is that of a food supermarket, or a non-food service use catering specifically to Asian customers, if that particular use is already in place in the Premises at such time, or (ii) for use as an restaurant serving Asian cuisine. Nothing contained herein shall limit or restrict Landlord's right to lease any premises in the Center for use as any other type of restaurant, or for any non-food use which does not cater specifically to Asian customers.

(2) Provided Tenant is not in default pursuant to the terms of this Lease beyond any applicable grace period, Tenant shall have the right of first refusal to lease other space in the Center for any use catering to the Asian population. Upon Landlord's receipt of a bona fide offer from a prospective tenant to lease space in the Center for a use catering to the Asian population, which offer is acceptable to Landlord in its sole discretion, Landlord shall notify Tenant in writing of the terms and conditions of such offer. Tenant shall have the right, for a period of ten (10) business days after its receipt of such written notice, to lease such space upon the same rent, terms and conditions as set forth in the bona fide offer received by Landlord. Such right shall be exercised by Tenant by delivering written notice of acceptance to Landlord within such ten (10) day period. If Tenant fails to exercise Tenant's right to lease such space within such ten (10) day period, such right of first refusal shall be deemed waived by Tenant, and Landlord shall be free to lease such space to the prospective tenant named in the original offer to lease at the rent and upon the terms and conditions set forth in such offer. This right of first refusal shall be limited to proposed uses catering to the Asian population, and shall not apply to any other offer to lease received by Landlord.

(c) Tenant covenants and agrees that Tenant, at its own expense will keep the premises free of insects, rodents, vermin and other pests. Within ten (10) days after the Commencement Date, Tenant shall deliver to Landlord a service contract from a qualified exterminating or similar service, providing for the Premises to be inspected quarterly and kept free of insects, rodents, vermin and other pests. Tenant shall keep such a service contract in full force and effect for the full Term of this Lease. Tenant further covenants and agrees that it shall not, at any time during the Term, keep any animals of any kind at the Premises, other than seafood for retail sale.

(d) Tenant shall not use or permit the use of any apparatus, or sound reproduction or transmission equipment, or any musical instrument in such manner that the sound so reproduced, transmitted or produced shall be audible beyond the confines of the Premises, and will not use any other advertising medium including, without limitation, flashing lights or searchlights which may be heard or experienced outside the Premises.

(e) Tenant covenants and agrees that it shall not cause, suffer or permit any waste or damage to the Premises or permit the Premises or any use thereof to constitute a nuisance or unreasonably interfere with the safety, comfort or enjoyment of the Center by Landlord or any other occupants of the Center or their customers, invitees or any others lawfully in or at the Center. Upon written notice from Landlord to Tenant that any of the aforesaid is occurring, Tenant agrees forthwith to cease and discontinue the same and within ten (10) days thereafter to make such changes in the Premises as may be required by Landlord for the purpose of obviating any such condition.

(f) Tenant shall not cause or permit objectionable odors to emanate or be dispelled from the Premises nor shall Tenant solicit business, distribute handbills or other advertising matter or hold demonstrations in the parking areas, walkways or other common areas of the Center.

(g) Tenant shall not use the plumbing facilities for any other purpose than that for which they are constructed and will not permit any foreign substance of any kind to be thrown therein and the expense of repairing any breakage, stoppage, seepage or damage, whether occurring on or off the Premises resulting from a violation of this provision by Tenant or Tenant's employees, agents or invitees shall be borne by Tenant. Tenant, at Tenant's sole cost and expense, shall maintain the grease traps serving the Premises in good condition and repair throughout the term of the Lease, and shall have such grease traps emptied and cleaned by a licensed contractor at least four (4) times per year and shall provide copies of the paid contractor's invoices to Landlord for verification.

(h) Tenant shall not place or cause or permit to be placed within the Premises any amusement devices of any kind.

(i)  Notwithstanding anything in this Lease to the contrary, Tenant shall not make any penetrations into the roof of the Premises or the Center.  In the event Tenant requires a penetration in the roof of the Premises, Tenant shall request Landlord's permission for same, which Landlord may deny, in its sole discretion. To the extent Landlord grants its permission for such roof penetration, such work shall be performed by a contractor approved by Landlord at Tenant's sole cost and expense.  In the event that Tenant violates any provision of this subparagraph (i), Landlord may, at its option, repair or replace any portion of the roof of the Building requiring repair or replacement as a result of damage caused by Tenant, at Tenant's sole cost and expense. Tenant shall be liable for any and all damages (direct, indirect and consequential) to Landlord and any and all other tenants of the Building, resulting from Tenant's breach of the provisions of this subparagraph (i).

(j)  Tenant shall not under any circumstances make any penetrations to the foundation or any other structural portions of the Premises without Landlord's prior written consent, provided Landlord agrees not to be unreasonably withhold its consent to any such work required in connection with the Initial Tenant Improvements.  To the extent Landlord grants its permission for any such penetration, such work shall be performed by a contractor approved by Landlord in its reasonable discretion, at Tenant's sole cost and expense.

(k) Tenant shall properly store and dispose of all food waste, and shall arrange for removal of food waste from the Premises on a daily basis.  Tenant shall not store any food outside of the Premises and shall take all steps necessary to avoid spillage of foods and food waste and shall not permit any odors to emanate from within the Premises or from outside of the Premises.  In no event may animal bodies, skins or carcasses be hung for display in the Premises such that same would be visible through the windows of the Premises.

(l)  Tenant shall keep the windows in the premises clean and free from grease and dirt.

(m)  Tenant shall provide store identification on its shopping carts; provide a regular program of removing shopping carts from the common areas and returning them to the interior of the Premises or to a shopping cart containment area at a location to be approved by Landlord; and remove all broken shopping carts from the Center.

## SECTION 14. LANDLORD'S OBLIGATIONS.

(a)  Except as otherwise provided in this Lease, Landlord, as part of Operating Costs, shall keep in good repair the structural parts of the Center, the Common Areas, common facilities and systems, grounds, shrubs and lawns in the Center, except for repairs or maintenance occasioned by the negligence or intentional act of Tenant or Tenant's agents, employees, licensees, contractors or invitees.  Any repairs or maintenance occasioned by the negligence or intentional act of Tenant's agents, employees, licensees, contractors or invitees shall be repaired at the cost and expense of Tenant.  The Landlord shall keep the driveways and parking areas reasonably free of snow and ice.

(b)  Except as specifically provided elsewhere in this Lease, there shall be no allowance to Tenant for a diminution of rental value and no liability on the part of Landlord by reason of inconvenience, annoyance or injury to business resulting from Landlord's, Tenant's or other's making or failing to make any repairs, alterations, additions or improvements in or to any portion of the Center, the Building or the Premises or in or to the fixtures, appurtenances or equipment thereof.  The provisions of this Section 14 with respect to the making of repairs shall not apply in the case of fire or other casualty, which is dealt with in Section 18 hereof or as elsewhere required in this Lease.

## SECTION 15. CONDITION OF PREMISES; REPAIRS.

The Tenant shall keep the Premises in good condition, repair and appearance, including without limiting the generality of the foregoing, all plumbing, pipes, electrical wiring and conduits which are for the exclusive use of Tenant and not located in the slab or foundation, all heating, air-conditioning, ventilating, electrical, lighting facilities and equipment within the Premises, fixtures, interior walls, ceilings, decking, floors, windows, doors, plate glass and skylights located within the Premises, and signs located on the Premises. The Tenant shall quit and surrender the Premises at the end of the Term in good condition, reasonable wear and tear excepted, and shall not make any alterations, additions or improvements to the Premises except in accordance with the

provisions of Section 16 of this Lease. Landlord reserves the right, sixty (60) days prior to the end of the Term, to demand that Tenant remove said alterations, additions or improvements or leave same. In the event that Landlord requires the removal of said alterations, additions or improvements, Tenant shall not be required to restore the Premises to their condition prior to the installation of said alterations, additions or improvements, provided Tenant shall repair any structural damage to the Premises, Building or the Center resulting from Tenant's removal of such items. All erections, alterations, additions and improvements, which are permanent in character, which may be made upon the Premises either by the Landlord or the Tenant, except for Tenant's furniture, trade fixtures, signage, machinery and equipment installed at the expense of the Tenant (which shall be removed by Tenant provided Tenant is not in default under any of the terms of this Lease), shall be the property of the Landlord and shall remain upon and be surrendered with the Premises as a part thereof at the expiration or sooner termination of this Lease, without compensation to the Tenant, unless removal is required by Landlord as aforesaid. Upon removing its furniture, trade fixtures, signage, machinery and equipment as provided above, Tenant shall repair any damage to the Premises and/or the Center caused by the installation or removal of said items. The Tenant further agrees to keep the Premises and all parts thereof, including, but not limited to, the loading docks, electrical wiring, plumbing and heating, ventilating and air conditioning equipment, platforms, windows, walkways, exits and entrances to the Premises, in a clean and sanitary condition and free from trash, snow, ice, inflammable materials and other objectionable matter.

SECTION 16. ALTERATIONS.

(a) The Premises are leased to Tenant in their strictly "AS IS" condition. Tenant shall be responsible for any and all work required for Tenant to open for business. Tenant shall be responsible for performing at its sole cost and expense, all demolition, alterations and improvements to the Premises required to commence its occupancy of the Additional Space (the "Initial Tenant Improvements") and shall be responsible for obtaining any and all permits, government approvals and a Certificate of Occupancy for the Premises. All work, alterations and improvements to be performed by Tenant or its contractors shall be performed in a good and workmanlike manner in accordance with the terms and provisions of this Lease.

(b) Tenant shall make no alterations, additions, permanent decorations, installations, substitution, or improvements in or to the Premises (including the Initial Tenant Improvements), or remove or install any partition, doors, electrical installations, plumbing installations, air-conditioning or cooling systems, or any other apparatus, whether structural or nonstructural (hereinafter collectively referred to as the "Tenant Changes"), without Landlord's prior written consent in each instance, which consent shall not be unreasonably withheld or delayed, and only upon complying with all of the provisions of this Section.

(c) Prior to commencing any Tenant Changes, including but not limited to any Initial Tenant Improvements, Tenant, at its sole cost and expense shall obtain and deliver to Landlord, for Landlord's prior consent and approval, all of the following:

(i) Detailed architect's plans and specifications, showing the proposed Tenant Changes;
(ii) A certificate evidencing that Tenant or Tenant's contractors have procured and paid for workers' compensation insurance covering all persons employed in connection with the Tenant Changes or who might assert claims for death or bodily injury against Landlord, Tenant, or the Center;
(iii) A certificate evidencing such additional personal injury and property damage insurance as Landlord may reasonably require in connection with the Tenant Changes;
(iv) Such building permits, approvals, authorizations or consents as may be required by any applicable law, rule, order or requirement of any governmental authority having jurisdiction thereof.

(d) In no event shall any material or equipment be incorporated in or to the Premises in connection with any Tenant Changes with is subject to any lien, encumbrance, security interest or charge of any kind whatsoever, or subject to any title retention agreement. Any construction lien claim or notice of unpaid balance or other lien filed against all or any part of the Premises or the Center or Landlord's interest therein, for work claimed to have been done for Tenant, or materials claimed to have been furnished to Tenant, shall be discharged by Tenant within ten (10) days thereafter, at Tenant's cost and expense, by filing any bond required by law or otherwise. Tenant

shall defend, indemnify and save Landlord harmless from and against any such liens and all costs and expenses (including reasonable attorney's fees) incurred by Landlord in connection therewith.

(e) Tenant shall cause all Tenant Changes to be performed promptly at its sole cost and expense, in a good and workmanlike manner, using prime quality new materials and equipment, at least equal in quality and class to the original Center installations, and in compliance with all applicable laws, and government rules, permits, authorizations, licenses, regulations and orders. Within thirty (30) days after the signing of this Lease, Tenant shall provide Landlord with its plans and specifications for the Initial Tenant Improvements, together with such other plans as Landlord may reasonably request, for review and approval by Landlord as provided in this Lease. Landlord agrees not to unreasonably withhold or delay its consent to such Initial Tenant Improvements. In the event Landlord does not disapprove such plans and specifications within twenty (20) days after receipt thereof by Landlord, such plans shall be deemed approved by Landlord. Tenant shall be responsible for obtaining all required building permits for the Initial Tenant Improvements, at its sole cost and expense.

(f) Tenant shall not disturb or interfere with or delay Landlord in the operation of the Center or the provision of services thereto or to any other lessees of the Center or any of their employees, agents, licensees or invitees in the performance of such Tenant Changes, and shall not obstruct any of the Common Areas or cause any damage or injury to the Center or to the property of Landlord or any other lessee of the Center, or any of their employees, agents, licensees or invitees.

(g) Tenant shall not exercise any of its rights pursuant to the provisions of this Section in a manner which would create any work stoppage, picketing, labor disruption or dispute, violate Landlord's union contracts affecting the Center, if any, or interfere with the business of Landlord or any other lessee or occupant of the Center. Nothing contained herein shall prohibit Tenant from using non-union labor to perform any Tenant Changes.

(h) Subject to the provisions of this Section 16, Landlord agrees that Tenant shall have the right to construct mezzanine space in the Additional Space, at Tenant's sole cost and expense. The issuance of any required governmental approvals for the construction of such mezzanine space shall not be a condition of this Lease and the completion of the construction of any such mezzanine space shall not affect or delay the Entire Space Rent Commencement Date. Landlord agrees that Tenant shall not be required to pay any Rent or Additional Rent to Landlord for the mezzanine space to be constructed by Tenant.

(i) Notwithstanding the right of Landlord to approve any matter described in this Section, Landlord shall have no responsibility or liability for the performance or quality of work or materials furnished by any contractor, subcontractor, agent or consultant of Tenant. The approval by Landlord, whether expressed or implied, of any Tenant Changes shall in no way affect Landlord's rights or Tenant's obligations relating to the restoration of the Premises at the expiration or other termination of the Term.

## SECTION 17. COMPLIANCE WITH RULES AND REGULATIONS; COMPLIANCE WITH LAW.

(a) Reasonable rules and regulations regarding the Premises and the Center, including the walkways and parking areas, and the use thereof, which may hereafter be promulgated by the Landlord, shall be observed by the Tenant and the Tenant's employees, agents and business invitees, as long as they are uniformly applied to and enforced against all tenants of the Center, and do not restrict the Tenant's ability to use all of the parking at the Center in common with the other tenants of the Center.. The Landlord reserves the right to rescind any rules promulgated hereafter, and to make such other and further rules and regulations as in its reasonable judgment may from time to time be desirable for the safety, care and cleanliness of the Premises and the Center and for the preservation of good order therein, which rules, when so made and reasonable notice given to the Tenant, shall have the same force and effect as if originally made a part of this Lease. Such other and further reasonable rules shall not, however, be inconsistent with the proper and rightful enjoyment by the Tenant of the Premises and the Center in the conduct of its business.

(b) Tenant's employees shall not be permitted to park in an area other than that designated by Landlord from time to time for such purpose, and Tenant agrees to take all steps necessary, upon notice from Landlord, required to enforce compliance with Landlord's parking regulations.

In the event Tenant's employees continue to violate Landlord's parking regulations after such notice from Landlord, Tenant shall pay to Landlord the sum of ten and 00/100 ($10.00) dollars per day for each car of its employees which is parked in an area other than that designated by Landlord for employee parking.

(c) Tenant shall, at its expense, comply promptly with all applicable statutes, ordinances, rules, regulations, orders, restrictions of record, and requirements in effect during the Term or any part of the term hereof relating to the use by Tenant of the Premises, including the making of structural and non-structural repairs or alterations due to Tenant's occupancy.

(d) Tenant hereby accepts the Demised Premises subject to all applicable zoning, municipal, county and state laws, ordinances, covenants of record, and regulations governing and regulating the use of the Premises, and accepts this Lease subject thereto and to all matters disclosed thereby and by any exhibits attached hereto. Landlord makes no representation as to any permissive use or zoning ordinance interpretation. Tenant shall be responsible for obtaining, at Tenant's cost and expense, a temporary and/or permanent Certificate of Occupancy for the Premises from the Township of East Brunswick permitting Tenant's use of the Premises as provided herein, if and to the extent required by applicable law. Provided however, the Commencement Date set forth in Section 10 shall not be delayed or otherwise extended by reason of Tenant's failure to obtain a Certificate of Occupancy on or before the Commencement Date.

SECTION 18. DAMAGES TO CENTER; WAIVER OF SUBROGATION.

(a) In the event of (i) the total destruction of the Premises by fire, explosion, the elements or any other cause during the Term or (ii) such partial destruction thereof as to render the Premises wholly untenantable, unfit for occupancy, or unusable for Tenant's purposes hereunder, and in the case of (i) or (ii), should the Premises be so badly damaged that the same cannot be repaired within one hundred eighty (180) days from the happening of such damage, then and in such case the term hereby created shall, at the option of Landlord or Tenant, to be exercised by written notice sent within thirty (30) days following the casualty or loss, cease and become null and void from the date of such damage or destruction, and the Tenant shall immediately surrender the Premises and all of the Tenant's interest therein to Landlord, and rent shall be adjusted between Landlord and Tenant to the time of such damage, in which event the Landlord may re-enter and repossess the Premises and may remove all parties therefrom; provided that Tenant shall not have the right to terminate this Lease in any such event if the damage is caused by Tenant or Tenant's employees, agents, licensees, contractors or invitees. If neither Landlord nor Tenant elects to terminate this Lease, or should the Premises be rendered untenantable and unfit for occupancy, but yet be repairable within one hundred eighty (180) days from the happening of such damage, Landlord shall restore or rebuild the Premises as nearly as possible to their previous condition with reasonable promptness, subject to Force Majeure. Landlord shall have no duty or obligation to restore Tenant's Property, equipment, fixtures or Tenant Changes, except to the extent Landlord actually receives insurance proceeds for damage thereto.

(b) In the event of the destruction of fifty (50%) percent or more of the rentable area of the Center by fire, explosion, the elements or any other cause during the Term and should same be so badly damaged that the damage cannot be repaired within one hundred eighty (180) days from the happening of such damage, then and in such case the term hereby created shall, at the option of Landlord, to be exercised by written notice sent to Tenant within thirty (30) days following the casualty or loss, cease and become null and void from the date of such damage or destruction, except as hereinafter provided. Upon such termination of this Lease, Tenant shall immediately surrender the Premises and all of the Tenant's interest therein to Landlord, and subject to the terms of this Lease, the Rent shall be adjusted between Landlord and Tenant to the time of such damage, in which event the Landlord may re-enter and repossess the Premises and may remove all parties therefrom. Notwithstanding the above, in the event Landlord elects to terminate this Lease and Tenant is continuing to operate its business in the Premises following such damage or destruction, this Lease shall terminate within ninety (90) days after such damage or destruction, and the Rent shall be adjusted between Landlord and Tenant to the time Tenant vacates the Premises. If Landlord does not elect to terminate this Lease, Landlord shall restore or rebuild the Center as nearly as possible to their previous condition with reasonable promptness, subject to Force Majeure.

(c) In any case in which Tenant's use of the Premises is materially and adversely affected by any damage to the Center or appurtenances thereto, there shall be either an abatement or an

equitable reduction in Basic Rent and Additional Rent depending on the period for which and the extent to which the Premises are not reasonably usable for the purpose for which they are leased hereunder. If the damage results from the fault of the Tenant, or Tenant's agents, contractors, employees or invitees, Tenant shall be entitled to an abatement or reduction in the Basic and Additional Rent, but not to exceed the amount of any rent insurance payable to Landlord.

(d) Tenant and Landlord each waive any and all rights of recovery against the other and against the officers, employees, agents, and representatives of the other, for loss or damage, etc., to such waiving party or its property or the property of others under its control, whether due to the acts or negligence of the other party, where such loss or damage is insured against under any insurance policy in force at the time of such loss or damage. In obtaining policies of insurance required by this Lease, Landlord and Tenant shall obtain a waiver of subrogation endorsement or an express provision in the policy having that effect. In the event that any insurer imposes a charge for making such waiver endorsement, the charge shall be paid by the respective party; and, in the event that either party fails to obtain such a waiver endorsement from its insurer, then the other party shall be likewise relieved from its obligation to do so. Nothing in this paragraph shall be construed as a waiver of recovery rights with regard to damages not compensated by insurance.

SECTION 19. EMINENT DOMAIN; CONDEMNATION.

(a) If the whole of the Premises shall be taken under the power of eminent domain, then this lease shall be terminated as of the day possession shall be taken.

(b) If more than twenty-five (25%) percent of the floor area of the Premises, or if more than thirty-five (35%) percent of the common parking area shall be taken under power of eminent domain, either Landlord or Tenant may terminate this lease by written notice given within thirty (30) days after the date or surrendering possession to the public authority pursuant to such taking, and if neither Landlord nor Tenant elects to terminate this lease, Landlord shall, at its cost and expense, restore and adapt the remaining Premises as reasonably required for Tenant's use, and the rent shall be reduced as described in Paragraph (c) of this Section.

(c) If twenty-five (25%) percent or less of the floor area of the Premises, or thirty-five (35%) percent or less of the common parking area shall be taken under the power of eminent domain, this lease shall not terminate but shall continue in full force and effect, except that the rent shall be reduced in the same proportion that the floor area of the Premises so taken bears to the total floor area demised to Tenant at the time of such taking, or, in the event of a taking of part of the parking area, the rent shall be equitably reduced; and Landlord shall, at its own cost and expense, make all necessary restorations to the Premises as to constitute the Premises or the building of which the Premises are a part, a complete architectural unit. In the event the Premises are not usable for the operation of Tenant's business as a result of a partial taking, the rent shall be equitably abated until Landlord completes the restoration of the Premises as provided above.

(d) Tenant shall not be entitled to any part of the award for such taking or any payment in lieu thereof, whether such award shall be awarded as compensation for diminution in value to the leasehold or to the fee of the Premises; provided however, Tenant may file a separate claim for any taking of fixtures and improvements made by Tenant, and for moving expenses and interruption of Tenant's business, provided the same shall in no way affect or diminish Landlord's award.

SECTION 20. ASSIGNMENT, SUBLETTING.

(a) Except as otherwise specifically provided in Section 13(a) of this Lease, Tenant shall not, without first obtaining the written consent of the Landlord, assign, mortgage, pledge or encumber this Lease in whole or in part, or sublease the Premises or any part thereof, which consent shall not be unreasonably withheld, conditioned or delayed. This covenant shall be binding upon the legal representatives of the Tenant and on every person to whom Tenant's interest under this Lease passes by operation of law, but shall not apply to an assignment or subletting to the parent, subsidiary or an affiliated corporation of the Tenant or a corporation under the same control as the Tenant, or a division of the Tenant, or to the transfer of Tenant's leasehold interest occasioned by a consolidation or merger involving the Tenant so long as the net worth of any such related entity or resulting entity is equal to or greater than the net worth of the Tenant prior to such consolidation or merger. Landlord agrees that Tenant shall have the right to sublease the Additional Space for operation of an Asian cuisine restaurant.

(b) To the extent Landlord's consent is required under this Lease, if Tenant shall desire to assign this Lease or sublet all or any portion of the Premises, it shall first submit in writing to the Landlord, the name and address of the proposed assignee or subtenant; the terms and conditions of the proposed assignment or subletting; the nature and character of the business of the proposed assignee or subtenant; banking, financial and other credit information relating to the proposed assignee or subtenant reasonably sufficient to enable Landlord to determine the proposed assignee's or subtenant's financial responsibility. Tenant shall, by notice in writing as described above, advise Landlord of its intention to assign this Lease or sublease all or any part of the Premises, on and after a stated date (which shall not be less than forty-five [45] days after the date on which Tenant's notice is given). Landlord shall thereupon have the right, to be exercised by giving written notice to Tenant within thirty (30) days after Landlord's receipt of Tenant's notice, to either consent to or object to the proposed assignment or sublease, or to recapture the Premises. Such recapture notice shall, if given, cancel and terminate this Lease with respect to the space therein described as of the date thirty (30) days following the date set forth in Tenant's notice, or thirty (30) days after Tenant shall have surrendered possession of the Premises, whichever is later, with no further obligation due by Tenant with respect to such space after said date. In the event less than all of the Premises are sublet or recaptured, Tenant or any permitted assignee or sublessee shall be obligated to construct and erect such partitioning and means of ingress and egress as may be required to sever the space retained by Tenant from the space recaptured or sublet. If this Lease should be cancelled pursuant to the foregoing with respect to less than the entire Premises, the Basic Rent and Additional Rent and Tenant's Proportionate Share shall be proportionately adjusted, and this Lease, as so amended, shall continue thereafter in full force and effect.

Landlord agrees that the above recapture provision shall not apply to an assignment of this Lease made by Tenant in connection with the sale of the Tenant's business at the Premises, or to any sublease, license agreement or concession permitted pursuant to Section 13(a) of this Lease.

(c) Any assignment or subletting shall not in any event release or discharge Tenant of or from any liability, whether past, present or future, under this Lease, and Tenant shall remain liable hereunder with respect to the entire Premises, except as otherwise provided herein or by law. The subtenant or assignee shall also agree in writing, to assume, comply with, and be bound by all of the terms, covenants, conditions, provisions and agreements of this Lease; and Tenant shall deliver to Landlord promptly after execution, an executed duplicate original copy of such assignment or sublease and an agreement of assumption by the assignee or subtenant.

(d) Any sublease or assignment must provide that it is subject to all of the terms and conditions of this Lease and any sublease must provide that in the event of the expiration or other termination of this Lease for any reason whatsoever whether voluntary, involuntary or by operation of law, prior to the expiration date of such sublease, the proposed subtenant agrees, but only if requested by and at the option of Landlord, to make full and complete attornment to Landlord for the balance of the term of the sublease. Such attornment shall be evidenced by an agreement in form and substance satisfactory to Landlord, which the proposed subtenant agrees to execute and deliver at any time within five (5) days after request of Landlord, its successors and assigns, and the proposed subtenant waives the provisions of any law now or hereafter in effect which may give the proposed subtenant any right of election to terminate the sublease or to surrender possession of the Premises in the event any proceeding is brought by Landlord under this Lease to terminate this Lease.

## SECTION 21. INDEMNITY AND TENANT'S INSURANCE.

(a) Tenant shall indemnify and hold harmless Landlord, its invitees, employees or assigns from and against any and all claims, liability, losses, damages, costs and expenses arising from Tenant's use of the Premises and any other part of the Center, or from the conduct of Tenant's business or from any activity, work or things done, permitted or suffered by Tenant in or about the Premises, the Common Areas or elsewhere, and shall further indemnify and hold harmless Landlord from and against any and all claims, losses and damages arising from any breach or default in the performance of any obligation on Tenant's part to be performed under the terms of this Lease, or arising from any negligence of the Tenant, or any of Tenant's agents, contractors, invitees or employees and from and against all costs, reasonable attorney's fees, expenses and liabilities incurred in the defense of any such claim or any action or proceeding brought thereon;

and in case any action or proceeding be brought against Landlord by reason of any such claim, Tenant, upon notice from Landlord, shall defend the same at Tenant's expense by counsel reasonably satisfactory to Landlord. Tenant, as a material part of the consideration to Landlord, hereby assumes all risk of damage to property or injury to persons in, upon or about the Premises arising from any cause and Tenant hereby waives all claims in respect thereof against Landlord. Provided, however, Tenant shall not be obligated to indemnify or release Landlord from any liability caused by or resulting from the negligence or willful misconduct of Landlord, its agents or employees.

(b) Tenant shall pay, provide and keep in force during the Term hereof, Comprehensive General Liability Insurance against claims for bodily injury, death or property damage occurring on, in or about the Premises or any appurtenances thereto, arising out of the ownership, operation and control of the Premises, including, but not limited to, contractual liability in connection with the indemnification of Landlord herein, in total limits of not less than $5,000,000.00 in respect to bodily injury or death to any one person, and $5,000,000.00 in respect to any one occurrence, accident or disaster, and property damage with limits of not less than $500,000.00 or such other amounts as may from time to time be reasonably required by Landlord, or the holder of the first mortgage. Tenant shall cause Landlord and any mortgagee to be named as an additional named insured on said liability insurance. Landlord agrees that a portion of the insurance coverage required of Tenant hereunder may be carried pursuant to umbrella coverage.

(c) Tenant covenants and represents, said representation being specifically designed to induce Landlord to execute this Lease, that Tenant's personal property, fixtures and all improvements, alterations and additions made by Tenant, and any other items which Tenant may bring to the Premises which may be subject to any claim for damages or destruction due to Landlord's negligence shall be fully insured by a policy of insurance covering all risks with no deductible, which policy shall specifically provide for a waiver of subrogation for Landlord without regard to whether or not same shall cost an additional premium and notwithstanding anything to the contrary contained in this Lease.

(d) Tenant shall provide and keep in force such other insurance and in such amounts as may, from time to time, be reasonably required by Landlord, or any mortgagee, wherein Landlord is named as an additional named insured, against such other insurable hazards as at the time are normally insured against in cases of premises similarly situated and similarly used.

(e) All insurance required to be provided by Tenant by the provisions of this Section shall be carried in favor of Landlord, Tenant, and any mortgagee, as their respective interests may appear, in such responsible companies licensed in New Jersey, and in such form as shall be reasonably satisfactory to Landlord. All policies referred to hereunder, and required to be procured by Tenant, shall be paid for by Tenant and shall be non-assessable and shall require thirty (30) days prior notice by the insurer by registered mail to Landlord, of any cancellation thereof or change therein affecting the coverage thereunder.

(f) Tenant shall procure policies for all said insurance for periods of not less than one (1) year and shall deliver to Landlord such policies and evidence of the payment of premiums thereon within ten (10) days after the date hereof (but in any event before Tenant commences occupancy of the Premises for any purpose), and shall procure renewals thereof from time to time, delivering certificates of said renewals to the Landlord at least thirty (30) days before the expiration thereof, together with such evidence of payment as is provided by the insurance carrier.

SECTION 22. FAILURE TO OBTAIN FIRE INSURANCE.

(a) Tenant shall not do or suffer anything to be done in the Premises which will increase the rate of fire insurance on the Center. If any of the policies of insurance as in this Lease provided to be obtained and maintained by Tenant or Landlord cannot be obtained and/or kept in force through Tenant's fault, and Tenant shall fail to commence to cure, remedy and correct the condition which makes it impossible to obtain and keep in force said policies within fifteen (15) days after written notice from Landlord, and Tenant fails, neglects or refuses to proceed diligently to cure such condition, Landlord may terminate this Lease by giving at least fifteen (15) days notice of such termination to Tenant, and this Lease shall terminate at the expiration date fixed by Landlord in said notice with the same force and effect as if that were the original expiration date hereof, and Tenant shall be and remain liable to Landlord for all damages and losses suffered by Landlord in the same manner as if this Lease were terminated for any other default by Tenant. In

lieu of exercising such right of termination, Landlord may, at its option, obtain such policies at regular or increased rates and pay premiums therefor, and Tenant shall reimburse Landlord for the amount of such premium (with respect to any policy required to be carried by Tenant under this Lease), or increase in premium (with respect to any policy carried by Landlord), upon demand, and if not paid, the amount thereof, together with interest at eighteen (18%) percent per annum, to accrue from the date of demand by Landlord, shall be added to the amount of the rent next coming due, as Additional Rent.

(b) If because of Tenant's occupancy, it shall be impossible to obtain fire insurance on the buildings and improvements in the Center in an amount and in form reasonably required by Landlord, and in fire insurance companies licensed in the State of New Jersey, the Landlord may, at is option, terminate this Lease on not less than thirty (30) days written notice to Tenant, and the term hereof shall terminate and come to an end as of the date set forth in Landlord's notice to Tenant and neither party shall have any further obligations hereunder with respect to the period arising after such termination date.

## SECTION 23. RIGHT TO INSPECT AND EXHIBIT.

Landlord may enter the Premises, but shall not be obligated to do so (except as required by any specific provision of this Lease), at any reasonable time on reasonable notice to Tenant (except that no notice need be given in case of emergency) for the purpose of making such repairs, replacements or additions, in, to, and about the Premises or the Center, as Landlord deems necessary or desirable; to inspect or protect the same; to effect compliance with any law, order or regulation of any governmental authority having jurisdiction; to take all required materials into the Premises for such purposes; to erect, use and maintain pipes and conduits in and through the Premises; provided Landlord shall not unreasonably interfere with Tenant's business operations in the Premises. In no event shall Tenant have any claims against Landlord for necessary and reasonable interruptions of Tenant's business, or for any other consequential damages sustained by Tenant in the course of such repairs, replacements or restoration, however occurring, nor shall any of the foregoing constitute an actual or constructive eviction of Tenant or subject Landlord to any liability or impose upon Landlord any obligation, responsibility or liability whatsoever, for the care, supervision or repair of the Center of which the Premises are a part, or any part thereof, other than as herein specifically provided, or entitle Tenant to any compensation or diminution or abatement of the rent reserved.

Landlord shall have the right to exhibit the Premises to prospective purchasers or lenders upon reasonable advance notice to Tenant. For twelve (12) months prior to the expiration of the Term, Landlord, or its agents, may exhibit the Premises to prospective tenants upon reasonable advance notice to Tenant, and put upon the Premises a suitable "To Let" sign.

## SECTION 24. NO LIABILITY OF LANDLORD.

Landlord and its agents, and employees, shall not be liable for any loss or damage to Tenant's property or otherwise, nor shall Landlord, its agents and employees be liable for any injury or damage to persons or property resulting from fire, explosion, falling plaster, steam, gas, electricity, water, rain or snow or leaks from any part of the Center or from the pipes, appliances or plumbing works or from the roof, street or sub-surface or from any other place or by dampness or by any other cause of whatsoever nature, unless caused by and due to the willful misconduct of Landlord or the negligent act or omission of Landlord, its agents or employees. Nothing contained herein shall be deemed to impose on the Tenant liability for any of the foregoing unless caused by Tenant.

## SECTION 25. LANDLORD'S EXCULPATION.

Notwithstanding the requirements of any provision of this Lease, Landlord shall not be liable for failure to furnish any services when such failure is due to Force Majeure. Landlord shall not be liable, under any circumstances, for loss of, or injury to, Tenant or Tenant's business or property however occurring, through or in connection with or incidental to the furnishing of, or failure to furnish, any services, except for the negligence or willful misconduct of Landlord, its agents and employees, in which event Tenant shall be entitled to a pro rata reduction in rent for the failure or interruption of such services for a period in excess of 72 hours.

SECTION 26.  UTILITIES, SERVICES, TAXES, ETC., AND HVAC.

(a)  The Tenant shall furnish heat and air conditioning at its own cost and expense.

(b)  Tenant shall repair all utility, ventilating, heating, air conditioning, electrical, gas and other utility lines within the Premises, except if damage outside of the Premises is caused by the negligence, acts or omissions of the Tenant, its agent, servants or employees, in which event Tenant shall likewise repair same outside of the Premises.  If the repair is required as a result of the negligence, acts or omissions of Landlord, its agents, servants or employees, Tenant shall notify Landlord, and Landlord shall have the option to (a) make the repairs at its sole cost and expense, or (b) have Tenant make the repairs, in which event Landlord will reimburse Tenant for the reasonable cost thereof.  Tenant shall replace, at its own expense, any and all glass which may be broken in and on the Premises.

Tenant shall be responsible for the repair and replacement of all heating and air conditioning equipment serving the Premises.

(c)  Tenant shall pay all costs for electricity, water, standby sprinkler charges, repairs to the sprinkler system within the Premises, if any, gas and other utilities and services consumed by it.

(d)  In the event that any utility deposits are necessary, Tenant shall pay said deposits to the utility company.

(e)  Tenant shall enter into and maintain during the Term hereof, a maintenance agreement with a qualified firm to service the heating, ventilating and air conditioning systems servicing the Premises, at Tenant's sole cost and expense.  Tenant shall provide Landlord with proof that such agreement is in effect upon request from Landlord.

SECTION 27. INSOLVENCY OF TENANT.

If at any time during the term of this Lease the Tenant shall make any assignment for the benefit of creditors, or be decreed insolvent or bankrupt according to law, or if a receiver is appointed for the Tenant, and the same is not dismissed within forty-five (45) days, then the Landlord may, at its option, terminate this Lease, exercise of such option to be evidenced by written notice to that effect served upon the assignee, receiver, trustee or other person in charge of the Tenant's estate or the liquidation of the Tenant's property.  Such termination shall not release or discharge any payment of rent payable hereunder and then accrued, or any liability then accrued by reason of any agreement or covenant herein contained on the part of Tenant or Tenant's legal representatives.

SECTION 28. DEFAULTS.

(a)  In the event that Tenant defaults in the payment of any Basic Rent or any Additional Rent and such default continues for ten (10) days after notice to Tenant, TIME BEING OF THE ESSENCE; or if Tenant fails to make any required payment of Basic Rent or Additional Rent by the tenth (10th) day of the month more than three (3) times in any twelve (12) month period; or if Tenant defaults in fulfilling any of the covenants or agreements of this Lease on its part to be kept or performed and such default is not cured within twenty (20) days after written notice from Landlord or its agent or if such default is of such nature that it cannot be completely cured within such period, Tenant does not commence such curing within twenty (20) days and thereafter fails to proceed with due diligence and in good faith to cure such default; or if this Lease is transferred to or devolves by merger, consolidation or operation of law upon any person, firm or corporation other than Tenant, except as may be specifically permitted by this Lease; or if Tenant abandons the Premises or Tenant fails to take possession of the Premises within ten (10) days after the Commencement Date; then and in any of such events, Landlord or its agent, may give Tenant a written notice specifying a day not less than five (5) days thereafter whereupon the Term shall end, and on the day specified the Term shall expire as if that day were the day herein fixed for the expiration of the Term, and Tenant shall then quit and surrender the Premises to Landlord and Tenant shall remain liable as herein provided.

(b)  Upon the occurrence of any of the events specified above, Landlord may re-enter the Premises and remove Tenant by summary proceedings or otherwise.  In case of any such re-entry, expiration of the Term and/or dispossess by summary proceedings or otherwise, the Basic Rent

and Additional Rent shall become due and payable up to the time of such re-entry, dispossess and/or expiration, together with such reasonable expenses as Landlord may incur in obtaining possession of the Premises (including but not limited to reasonable attorneys' fees, brokerage fees and/or the cost of putting the Premises in good order, and for preparing the same for re-rental) but Tenant shall not be responsible for substantial "build to suit" types of expenses. Landlord may relet the Premises or any part or parts thereof, for a term or terms which may at Landlord's option be less than or exceed the period which may otherwise have constituted the balance of the Term and may grant reasonable concessions, or free rent and Tenant shall not be credited therewith; and Tenant or the legal representatives of Tenant shall also pay Landlord as liquidated damages for the failure of Tenant to observe and perform said Tenant's covenants herein contained, any deficiency between all Basic Rent and Additional Rent hereby reserved and/or covenanted to be paid and the net amount, if any, of the basic and additional rents collected on account of the lease of the Premises for the period which would otherwise have constituted the balance of the Term. Any such liquidated damages shall be paid in monthly installments by Tenant on the rent days specified in the Lease, until Landlord or Tenant shall elect to accelerate the payment of such liquidated damages, in which event Tenant shall pay Landlord, within ten (10) days after Landlord's demand, an amount equal to such deficiency above discounted to present value by allowing interest at the rate of four (4%) percent per annum. Any suit brought to collect the amount of such deficiency for any month shall not prejudice in any way the rights of Landlord to collect the deficiency for any subsequent month by a similar proceeding. Landlord shall not be liable for inability to relet the Premises, provided Landlord shall use reasonable efforts to mitigate it's damages. The words "re-enter" or "re-entry" as used in this Lease shall not be restricted to their technical legal meaning. Tenant shall not be entitled to any surplus accruing to Landlord as a result of any reletting and no such reletting shall constitute a surrender and acceptance or be deemed evidence thereof. Tenant hereby waives all rights of redemption to which Tenant or any person under Tenant might be entitled by any law now or hereafter in force.

(c) In the event of a breach or threatened breach by Tenant of any of the covenants or provisions of this Lease, Landlord shall have the right of injunction and the right to invoke any remedy allowed at law or in equity as if re-entry, summary proceedings and other remedies were not herein provided for. Mention in this Lease of any particular remedy shall not preclude Landlord from any other remedy, in law or in equity.

(d) If Tenant shall default in the performance of any provision, covenant or condition on its part to be performed under this Lease, Landlord may, at its option, after expiration of any applicable cure period (except in case of emergency) perform the same for the account and at the expense of Tenant. If Landlord at any time shall be compelled to pay or elects to pay any sum of money or do any act which requires the payment of any sum of money by reason of the failure of the Tenant to comply with any provision of this Lease, or if Landlord incurs any expense including reasonable attorneys fees in prosecuting or defending any action or proceeding by reason of any default of Tenant under this Lease, the sums so paid by Landlord with interest at the rate of eighteen (18%) percent per annum, together with costs and damages shall be due from and be paid by Tenant to Landlord on demand as additional rent hereunder.

SECTION 29.  REAL ESTATE TAXES.

(a) In addition to the Basic Rent, Tenant shall pay its Proportionate Share of Real Estate Taxes imposed on the Center to be included as part of Landlord's Operating Costs payable pursuant to Section 4 of this Lease. Notwithstanding the above, Landlord may invoice Tenant separately for Tenant's Proportionate Share of Real Estate Taxes, provided such Real Estate Taxes are not otherwise included in Tenant's share of Operating Costs for the applicable period. For the purposes of this Section, "Real Estate Taxes" shall mean the real estate taxes, water and sewer charges, assessments and other governmental charges imposed upon the Center and the improvements thereon. If and to the extent that due to a change in the method of taxation or assessment, any franchise, capital stock, capital gains, rent, income, profit or any other tax or charge shall be substituted in whole or in part for the current ad valorem taxes now or hereafter imposed upon the real estate, such franchise, capital stock, capital gains, rent, income, profit or other tax or charge shall be deemed included in the term Real Estate Taxes for the purpose of this Section.

(b) If Landlord shall institute a tax appeal, and said tax appeal shall result in a reduction in taxes, then the Tenant shall pay to Landlord its Proportionate Share of Landlord's costs of said

appeal, but in no event shall that amount exceed the reduction in taxes, and Tenant shall receive or be credited with its Proportionate Share of any refund or reduction.

SECTION 30. SIGNS.

Landlord agrees that Tenant shall have the right to place a sign on the facade over the Additional Space, at Tenant's sole cost and expense, at a location to be agreed to by Landlord (with Landlord's consent not to be unreasonably withheld or delayed), subject to the provisions hereof. Tenant shall have the right to maintain its existing signage over the Existing Space, as well as its existing pylon sign. Landlord further agrees that Tenant shall have the right to install, at Tenant's cost and expense, a sign panel on the pylon sign for the Center located at the Lake Avenue side of the Center at the location next to the "Coldwell Banker" sign (as shown on Schedule E annexed hereto). Landlord further agrees that in the event its pending application to increase the sign space on the Lake Avenue pylon sign is granted by the Township of East Brunswick, Tenant shall be entitled to use the sign space added to the lower portion of the Lake Avenue pylon for its pylon sign, provided Tenant shall simultaneously remove its sign from the space next to Coldwell Banker sign. Landlord shall be responsible for the cost of proceeding with its application to increase the sign space on the Lake Avenue pylon and for construction of such additional space, if and when approved. Tenant shall be responsible for the cost of installing and removing its pylon signage. The design of Tenant's pylon sign shall be consistent with the design of other signs in the Center.

No sign shall be affixed to or placed upon any exterior part of the Premises or the Center by the Tenant, except in such manner, and of such size, design and color as shall be approved in advance by the Landlord in writing. Tenant shall not place any signs in the windows of the Premises without Landlord's prior written consent. Landlord agrees that it will not withhold its consent to the style or design of any sign which is generally consistent with the design of existing signs in the Center, provided the sign is not a "box sign".

Tenant shall be responsible for complying with any and all applicable laws, rules and regulations relating to any signage to be erected by Tenant.

Landlord makes no representation that any of Tenant's signage will be permitted by the Township of East Brunswick and Tenant shall be responsible for complying with any and all applicable laws, rules and regulations relating to any signage to be erected by Tenant.

At the expiration or termination of this Lease, Tenant shall remove all of its signage, and shall repair any damage to the Premises or to the pylon signs resulting from such removal.

SECTION 31. OUTSIDE STORAGE.

Tenant shall not store any goods, other than temporarily in connection with the delivery of any item, outside of the Premises or any place in the Center.

SECTION 32. FINANCIAL STATEMENTS.

Tenant shall, if required by Landlord's mortgagee or any future mortgagee, or prospective mortgagee or prospective purchaser, submit to Landlord, any prospective mortgagee or purchaser, without cost to the Landlord, a copy of Tenant's current financial statement which shall be considered "confidential" by the recipient. Tenant shall also, without cost to Landlord, submit to any prospective mortgagee or purchaser such prior statements as it may have, as and when required by Landlord or Landlord's mortgagee or prospective mortgagee or prospective purchaser but in no event for more than two (2) years before the current financial statement's year.

SECTION 33. INTENTIONALLY OMITTED.

SECTION 34. SUBORDINATION; PRIORITY OF FEE MORTGAGES.

This Lease, any amendments, extensions, options (if any) and any other rights granted to Tenant hereunder shall be subject and subordinate at all times in lien and priority to any and all present and future ground and underlying leases affecting all or any part of the Center and to any and all mortgages which may now or hereafter be placed on or affect such leases, and/or the Center, and to all renewals, modifications, consolidations, and extensions thereof, without the

necessity of any further instrument or act on the part of Tenant. Tenant shall execute and deliver upon demand any further instrument or instruments confirming the subordination of this Lease to the lien of any such ground and/or underlying lease or mortgage if requested to do so by Landlord, and any further instrument or instruments of attornment that may be reasonably desired by any such mortgagee or Landlord. Notwithstanding the foregoing, any mortgagee may at any time subordinate its mortgage to this Lease without Tenant's consent, by giving notice in writing to Tenant, and thereupon this Lease shall be deemed prior to such mortgage without regard to their respective dates of execution and delivery, and in that event, such mortgagee shall have the same rights with respect to this Lease as though this Lease had been executed prior to the execution and delivery of the mortgage and had been assigned to such mortgage. Landlord agrees to use its best efforts to promptly obtain a nondisturbance agreement from the existing mortgagee of the Center, in form satisfactory to such mortgagee.

## SECTION 35. MORTGAGEE PROTECTION CLAUSE.

Tenant agrees to give all mortgagees and/or trust deed holders, by certified mail, a copy of any notice of default served on Landlord, provided that prior to such notice Tenant has been notified, in writing (by way of notice of assignment of rents and leases or otherwise), of the name and address of such mortgagees and/or trust deed holders. The mortgagees and/or trust deed holders shall have the same time within which to cure such default as is given to Landlord under this Lease. Failure to provide such notice within any specified period of time shall not constitute a waiver by Tenant of its rights with respect to such default; however, Tenant may not exercise any rights against Landlord until the mortgagees and/or trust deed holders have been given the notice and opportunity to cure provided for above. Landlord shall within ten (10) days of the execution of this Lease provide Tenant with the name and address of the existing mortgage holder for the Center, and shall notify Tenant within ten (10) days of the name and address of any new mortgage holders, provided Landlord's failure to notify Tenant as provided herein shall not constitute a default hereunder.

## SECTION 36: WATER, STANDBY SPRINKLER, SPRINKLER ALARM AND SEWER (IF ANY) CHARGES:

Tenant shall pay as Additional Rent (and not as part of Operating Costs) its Proportionate Share of water, standby sprinkler and sprinkler alarm (if any), and sewer (if any) charges for the entire Center. Tenant shall pay to Landlord in monthly installments on the first day of each month its estimated Proportionate Share of such charges. Upon receipt of a final bill or bills for such charges for each year of the Term, each party agrees to pay the other on demand, such amount as may be necessary to adjust the amount paid hereunder to the actual amount paid to the entity providing such service and/or utility; provided, however, should Landlord owe Tenant, such amount may be treated as a credit to Tenant's next succeeding payments for such charges. The monthly installments of such charges shall be increased or decreased on account of such final bill or bills.

## SECTION 37. BUSINESS HOURS.

The Tenant agrees to conduct its business and generally remain open Monday to Friday, from approximately 10:00 a.m. to 9:00 p.m.; Saturday from 10:00 a.m. to 5:30 P.M. and Sunday from 11:00 a.m. to 5:00 p.m., except that Tenant may close on July 4, New Year's Day, Thanksgiving Day, Christmas Day, Mother's Day, Easter Sunday, Memorial Day, and Labor Day. In the event Tenant does not remain open as aforesaid, and Tenant continues to violate this provision without good cause following written notice from Landlord, it shall pay Landlord, as Additional Rent, $250.00 per day for each day or part thereof that it is closed. Nothing contained herein shall be deemed to restrict or prevent Tenant from opening for business at additional times, subject to applicable laws, ordinances, rules and regulations. Tenant need not remain open because of severe inclement weather, or by reason of fire or other casualty at the Premises, or by reason of force majeure, or during those hours and days that Tenant using commercial good business judgment and prudence shall reasonably determine. Tenant may also temporarily close for business for such reasonable period of time required for renovations or for repairs resulting from damage to the Premises.

## SECTION 38.  CENTER.

(a) The Center shall include the parcel(s) of land and improvements generally depicted as the Center whether owned in fee or ground leased by Landlord.  Landlord reserves the right to add to or sever the ownership of or title to any portion of the Center at any time.  It is agreed that the depiction of the Center does not constitute a representation, covenant or warranty of any kind by Landlord.  Landlord reserves the right to change the size and dimensions of the Center, the number and location of buildings, building dimensions, the number of floors in any of the buildings, store dimensions, identity and type of other stores and tenancies, and the Common Areas, all subject to the provisions of this Lease, and provided same does not unreasonably interfere with Tenant's use of the Premises.  This Lease shall not be affected or impaired by any change to, or easements or other rights granted in, any lawns, sidewalks, driveways, curb cuts or streets adjacent to or around the Center, except as provided in the provisions of this Lease dealing with condemnation.

(b)  In the event that the Landlord exercises its rights pursuant to paragraph (a) above, Operating Costs, Real Estate Taxes and water and sewer charges shall be determined pursuant to Section 8 hereof on the basis of the redefined Center.

(c)  Landlord shall have the right to convert the Premises and/or the Center into condominiums and in connection therewith Landlord shall be permitted to assign this Lease to the owner of a condominium which includes the Premises.  In such event, the Tenant agrees to attorn to the owner of such condominium as Landlord under this Lease.

## SECTION 39.  CONTROL OF TENANT.

If Tenant under this Lease is a corporation, other than a public corporation, or a limited liability company, and if at any time during the Term of this Lease a majority of such corporation's shares of capital stock or membership interests shall be transferred to a related entity or corporation, Tenant shall so notify Landlord.  If Tenant is a corporation or limited liability company, and more than fifty (50%) percent of the stock ownership, membership interests or voting control of Tenant is transferred to a non-related person, entity or corporation, same shall be deemed an assignment of this Lease and shall be governed by the provisions of Section 20 of this Lease.

## SECTION 40.  PROCESSING CHARGE.

Tenant agrees to reimburse Landlord for reasonable attorneys' fees and accounting fees incurred by Landlord in connection with the processing and documentation of any assignment, subletting, license, concession, creation of a security interest, granting of a collateral assignment, change of ownership or other transfer required by Tenant for which Landlord's consent is required or sought.  Tenant agrees that Landlord shall not be required to take any action thereon until Landlord is paid such amount.  Such amount is to be paid no later than the next monthly Basic Rent installment date.

## SECTION 41.  RIGHT OF FIRST REFUSAL.

In the event that any or all of Tenant's interest in the Premises and/or this Lease is transferred by operation of law to any trustee, receiver, or other representative or agent of Tenant, or to Tenant as a debtor in possession, and subsequently any or all of Tenant's interest in the Premises and/or this Lease is offered or to be offered by Tenant or any trustee, receiver, or other representative or agent of Tenant as to its estate or property (such person, firm or entity being hereinafter referred to as the "Grantor"), for assignment, conveyance, lease, or other disposition to a person, firm or entity other than Landlord (each such transaction being hereinafter referred to as a "Disposition"), it is agreed that Landlord has and shall have a right of first refusal to purchase, take, or otherwise acquire the same upon the same terms and conditions as the Grantor thereof shall accept upon such Disposition to such other person, firm, or entity; and as to each such Disposition the Grantor shall give written notice to Landlord in reasonable detail of all of the terms and conditions of such Disposition within twenty (20) days next following its determination to accept the same but prior to accepting the same, and Grantor shall not make the Disposition until and unless Landlord has failed or refused to accept such right of first refusal as to the Disposition, as set forth herein. The parties agree that the right of first refusal set forth in this

Section 41 shall only apply in the event a petition in bankruptcy, receivership, assignment for the benefit of creditors or similar insolvency proceeding is filed by or against Tenant.

Landlord shall have thirty (30) days next following its receipt of the written notice as to such Disposition in which to exercise the option to acquire Tenant's interest by such Disposition, and the exercise of the option by Landlord shall be effected by written notice to that effect sent to the Grantor by certified or registered mail; but nothing herein shall require Landlord to accept a particular Disposition or any Disposition, nor does the rejection of any one such offer of first refusal constitute a waiver or release of the obligation of the Grantor to submit other offers hereunder to Landlord. In the event Landlord accepts such offer of first refusal, the transaction shall be consummated pursuant to the terms and conditions of the Disposition described in the notice to Landlord. In the event Landlord rejects such offer of first refusal, Grantor may consummate the Disposition with such other person, firm, or entity; but any decrease in price of more than ten (10%) percent of the price sought from Landlord or any change in the terms of payment for such Disposition shall constitute a new transaction requiring a further option of first refusal to be given to Landlord hereunder.

SECTION 42: ENVIRONMENTAL MATTERS

(a) At all times during the Term of this Lease, Tenant shall handle hazardous substances and waste as defined in the New Jersey Industrial Site Recovery Act ("ISRA"), as same may from time to time hereinafter be amended, in such fashion as to avoid any discharge of hazardous substances or wastes at the Premises. Tenant represents and warrants that the business operations which it shall conduct at the Premises do not constitute the operation of an industrial establishment as defined in ISRA or, on the other hand, if it is or at any time shall become such an industrial establishment, Tenant will comply with all requirements during operations and at the time of closing, terminating or transferring the operations, at its sole cost and expense. Tenant shall cooperate with Landlord in any effort of Landlord to obtain all approvals under ISRA which are necessary to the completion of any transaction respecting the Landlord or the Premises, whether or not Tenant is a party to such transaction; provided, however, that Tenant shall not be obligated to incur any expense in connection with a sale of the Center by Landlord, wherein Tenant has had no ISRA-related activity at the Premises. Notwithstanding anything herein to the contrary, the provisions of this section shall survive the termination of tenancy under this Lease. Tenant's Industry Group NAICS code is 445110 (supermarket use) and 722110 (full-service restaurant). The Tenant agrees not to store any hazardous substances or waste as defined by ISRA on the Premises, other than in de minimus amounts required in connection with cleaning or normal consumer uses.

(b) Tenant shall, at Tenant's sole cost and expense, comply with any and all Federal, State and local laws and regulations pertaining to environmental concerns, including but not limited to waste disposal, spills, pollution, contamination and clean-up as may be required thereunder, and shall make all submissions and provide all information that may be required.

(c) Tenant represents, covenants and warrants that Tenant shall not "discharge" (as such term is defined in the Spill Compensation and Control Act, N.J.S.A. 58:10-23.11, et seq. [the "Spill Act"]), "hazardous substances" (as such term is defined in the Spill Act), or use the Premises is such manner as to become liable under the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. 9601, et seq. ("CERCLA"). In the event that a lien is filed against the Premises or the Center or any part thereof pursuant to and in accordance with the Spill Act or CERCLA, arising from the intentional or unintentional acts or omissions of Tenant, or its employees, agents, contractors, licensees, invitees, assigns or subtenants, then Tenant shall, within thirty (30) days from the date Tenant is given notice of the lien or in such shorter period of time in the event the State of New Jersey or the United States, or any agency or subdivision thereof, has commenced steps to cause the Premises or the Center or any part thereof to be sold pursuant to the lien, pay the claim and remove the lien. If Tenant fails to remove the lien as required hereunder, Landlord shall be entitled to terminate this Lease, in addition to any other remedies permitted by law, in equity or otherwise.

(d) Tenant agrees to indemnify, defend and hold Landlord and its officers, employees and agents harmless from any and all claims, judgments, damages, fines, penalties, liabilities, costs and expenses (including reasonable attorney's fees, consultant fees and expert fees) which arise during or after the Term of this Lease in connection with the presence or suspected presence of toxic or hazardous substances or wastes in the soil, groundwater on or under the Center or in the

Premises caused by the acts of Tenant, its officers, employees, agents, contractors or invitees. Notwithstanding anything herein to the contrary, the provisions of this section shall survive the termination of the tenancy under this Lease.

(e) Landlord agrees to indemnify, defend and hold Tenant and its officers, employees and agents harmless from any and all claims, judgments, damages, fines, penalties, liabilities, costs and expenses (including reasonable attorney's fees, consultant fees and expert fees) which arise during or after the Term of this Lease in connection with the presence of hazardous or toxic substances in the soil, groundwater on or under the Center or the Premises caused by the acts of Landlord, its officers, employees, agents, contractors or invitees, except to the extent such substances are present as the result of the acts or omissions of Tenant, its officers, employees, agents, contractors or invitees. Notwithstanding anything herein to the contrary, the provisions of this Subsection shall survive the termination of the tenancy under this Lease. Nothing contained herein shall limit or restrict or be deemed to limit or restrict Landlord's rights or remedies as to any third party, at law or in equity. Tenant agrees to notify Landlord of the presence of any such materials in the Premises or the Center immediately upon becoming aware thereof.

## SECTION 43. MODIFICATIONS REQUESTED BY MORTGAGEE.

In the event that any existing or prospective mortgagee of the Center shall request a change in the language of the terms of this Lease, or the execution of any document in connection therewith, Tenant agrees to make such change or execute such document provided the same shall not increase Tenant's obligations or liabilities under this Lease, reduce Landlord's obligations or liabilities under this Lease, or unreasonably interfere with Tenant's business or rights hereunder.

## SECTION 44. QUIET ENJOYMENT.

Landlord represents that it has title to the Center and has the full right and power to execute and perform this Lease and to grant the estate demised herein. Landlord covenants and agrees that if and so long as Tenant pays the rent herein reserved, and performs and observes the covenants, conditions and agreements hereof upon the part of the Tenant to be performed and observed, Landlord (and any party claiming by, through or under Landlord) shall do nothing to affect Tenant's right to peaceably and quietly have, hold and enjoy the Premises for the term herein mentioned, subject to the provisions of this Lease.

## SECTION 45. ESTOPPEL CERTIFICATE.

Tenant agrees, at any time, and from time to time, upon not less than ten (10) days' prior notice by Landlord, to execute, acknowledge and deliver to Landlord, a statement in writing, addressed to Landlord and to any mortgagee, prospective mortgagee, or any other party specified by Landlord, certifying that this Lease is unmodified and in full force and effect (or, if there have been modifications, describing them), and stating that Tenant has accepted possession; the dates to which basic rent, additional rent and other charges have been paid, the date on which the term of the Lease commenced and stating whether or not to the best knowledge of the signer of such certificate, there exists any default by either party in the performance of any covenant, agreement, term, provision or condition contained in this Lease, and, if so, specifying each such default of which the signer may have knowledge, and stating any other fact or certifying any other condition reasonably requested by Landlord or reasonably required by any mortgagee, prospective mortgagee or purchaser or assignees of such mortgagee or of Landlord, it being intended that any such statement delivered pursuant hereto may be relied upon by Landlord or a purchaser of Landlord's interest and by any mortgagee or prospective mortgagee.

## SECTION 46. HOLDING OVER.

In the event that Tenant shall remain in occupancy of the Premises for any period beyond the expiration of the term of this Lease or any renewals or extensions thereof, such occupancy shall be deemed to be a month-to-month tenancy at a monthly rental equal twice the sum of the Basic Rent and Additional Rent payable for the last month of the Term, and Tenant shall be liable for any additional damages that might be suffered by Landlord. The acceptance of rent by Landlord shall not be deemed to create a new or additional tenancy other than as aforesaid. Nothing contained herein shall be deemed to limit or restrict Landlord's rights at law or in equity, in the event Tenant remains in occupancy of the Premises upon the expiration of the Term without Landlord's consent.

## SECTION 47. NO WAIVER; ENTIRE AGREEMENT; NO SURRENDER.

(a) The failure of Landlord or Tenant to seek redress for violation of, or to insist upon the strict performance of any covenant, agreement, term, provision or condition of this Lease, or any of Landlord's Rules and Regulations shall not constitute a waiver thereof and Landlord and Tenant, as the case may be, shall have all remedies provided herein and by applicable law with respect to any act, which would have originally constituted a default by the other party hereunder. The receipt by Landlord of Basic Rent or Additional Rent with knowledge of the breach of any covenant, agreement, term, provision or condition of this Lease shall not be deemed a waiver of such breach. The failure of Landlord to bill or collect rent in a timely fashion shall not be construed as a waiver of Landlord's right to collect rent at any time during the Term or any time thereafter.

(b) This Lease with the schedules, riders and exhibits, if any, annexed hereto contains the entire agreement between Landlord and Tenant, and any agreement hereafter made between Landlord and Tenant shall be ineffective to change, modify, waive, release, discharge, terminate or effect a surrender or abandonment of this Lease, in whole or in part, unless such agreement is in writing and signed by the party against whom enforcement is sought.

(c) No employee of Landlord or of Landlord's agents shall have any power to accept the keys of the Demised Premises prior to the termination of the Lease. The delivery of keys to any employee of Landlord or of Landlord's agents shall not operate as a termination of the Lease or a surrender of the Premises. In the event of Tenant at any time desiring to have Landlord sublet the Premises for Tenant's account, Landlord or Landlord's agents are authorized to receive the keys for such purposes without releasing Tenant from any of the obligations under this Lease. Tenant hereby relieves Landlord of any liability for loss or damage to any of Tenant's effects in connection with such subletting.

(d) No payment by Tenant or receipt by Landlord of an amount less than the Rent stipulated in this Lease shall be deemed to be other than on account of the earliest stipulated Rent, nor shall any endorsement or statement on any check or any letter accompanying any check or payment as rent be deemed an accord and satisfaction, and Landlord may accept such check or payment without prejudice to Landlord's right to recover the balance of such rent or pursue any other remedy provided in this Lease or by law.

## SECTION 48. REIMBURSEMENT OF LEGAL EXPENSES.

Tenant agrees to pay to Landlord upon demand, as additional rent, a sum equal to all costs and expenses (including reasonable attorney's fees) incurred by Landlord during or after the Term in enforcing all or any of Landlord's rights under this Lease because of a breach by Tenant, whether or not an action or proceeding is commenced, or levying and collecting on any judgment in Landlord's favor.

## SECTION 49. BROKER.

Tenant and Landlord warrant and represent to each other that there are no brokers who negotiated or brought about this transaction. Tenant and Landlord shall indemnify, defend and hold each other harmless from and against any and all claims for any brokerage commissions or other compensation asserted by any broker or person in connection with this Lease, arising from the respective acts of Tenant or Landlord in breach of this representation and warranty, including but not limited to any costs and expenses (including reasonable attorneys fees) related thereto.

## SECTION 50. OPTION TO RENEW.

Tenant is hereby granted three (3) consecutive options to renew this Lease for a period of five (5) years each, upon the following terms and conditions:

(a) At the time of the exercise of the applicable option to renew and at the time of the said renewal, Tenant shall not be in default beyond applicable grace periods in accordance with the terms and provisions of the Lease, and Tenant or any permitted assignee or sublessee shall be in possession of the Premises pursuant to this Lease.

(b) Notice of exercise of the option shall be sent to Landlord, in writing, at least six (6) months, but not more than twelve (12) months before expiration of the term of this Lease.

(c) Each renewal term shall be for a term of five (5) years to commence at the expiration of the term of this Lease, as same may have been previously extended, and all of the terms and conditions of this Lease, other than the Basic Rent shall apply during such renewal term.

(d) The Basic Rent to be paid during such renewal term shall be payable in monthly installments as set forth on Schedule B annexed hereto and made a part hereof.

## SECTION 51. EXECUTION BY LANDLORD.

The submission of this Lease Agreement for examination does not constitute a reservation of or option for the Premises and this Lease shall be of no force and effect whatsoever unless it shall have been executed by the Landlord.

## SECTION 52. RECORDATION.

Tenant covenants not to place this Lease or the Commencement Date certificate referred to in Section 10(a) on record. At the request of Landlord or Tenant made at any time after the Commencement Date, the other party will execute a memorandum of lease for recording purposes containing references to the material provisions of this Lease as Landlord and Tenant shall mutually deem necessary. If requested by Landlord, Tenant shall execute a recordable discharge of the memorandum of lease and deliver same to Landlord's attorney prior to recording the memorandum, to be held in escrow until expiration or termination of this Lease in accordance with its terms.

## SECTION 53. NOTICES.

Any notice, request or demand permitted or required to be given by the terms and provisions of this Lease, or by any law or governmental regulation, either by Landlord to Tenant or the Tenant to Landlord, shall be in writing, and shall be delivered by hand, courier service or recognized overnight delivery service, or mailed by registered or certified mail, return receipt requested, addressed if to Tenant, to Attention: Jeffrey Wu, with a copy to Hayes Young, Esq., Shestack & Young, LLP, 233 Broadway, New York, NY 10279; and if to Landlord, to Attention: Leon Harary, 275 Route 18, East Brunswick, NJ 08816, with a copy to Richard A. Epstein, Esq., 2 Bucks Lane, Marlboro, New Jersey 07746. Such notice, request or demand shall be deemed given when actually delivered or if mailed, when received by the addressee as evidenced by the return receipt, or if refused, the date on which delivery was first attempted as evidenced by the postal records. Either party may from time to time, by notice as aforesaid, designate a different address for notices, requests or demand.

## SECTION 54. PERSONS BOUND.

The covenants, agreements, terms, provisions and conditions of this Lease shall bind and inure to the benefit of the respective heirs, distributees, executors, administrators, successors, assigns and legal representatives of the parties hereto with the same effect as if mentioned in each instance where a party hereto is named or referred to, but nothing herein contained shall be construed to give Tenant the right to assign this Lease. The covenants and obligations on the part of Landlord under this Lease shall not be binding upon Landlord herein named with respect to any period subsequent to the transfer of its interest in the Center, by operation of law or otherwise, and in the event of such transfer or any subsequent transfer Tenant agrees to look solely to the transferee for the performance of Landlord's covenants and obligations, but only with respect to the period beginning with such transfer and ending with a subsequent transfer of such interest, and all acts, covenants or obligations due on the part of Landlord during its ownership shall survive any act of transfer of the fee title to or leasehold interest in the Center.

## SECTION 55. PARTIAL INVALIDITY.

If any provision of this Lease or any application thereof to any person or circumstance shall be determined to be invalid or unenforceable, the remaining provisions of this Lease or the application of such provision to persons or circumstances other than those to which it is held

invalid or unenforceable shall not be affected thereby and shall be valid and enforceable to the fullest extent permitted by law.

SECTION 56. CONSENTS.

With respect to any provision of this Lease which requires that Landlord shall not unreasonably withhold or delay its consent or approval, Tenant shall not make or assert any claim for, and Tenant hereby waives any claim for money damages. Tenant shall not claim any money damages by way of setoff, counterclaim or defense, based upon any claim or assertion by Tenant that Landlord has unreasonably withheld or unreasonably delayed any consent or approval. Tenant's sole and exclusive remedy shall be an action or proceeding for specific performance, injunction or declaratory judgment.

SECTION 57. LANDLORD'S LIEN.

To secure the payment of all of the rents, taxes, charges, penalties and damages herein covenanted to be paid by Tenant, and for the purpose of securing all of the Tenant's obligations under this Lease, Tenant hereby gives to Landlord an express lien on and security interest in all property, equipment, chattels and fixtures which may be placed in or on the Premises and also on any proceeds of insurance which may accrue to Tenant by reason of damages to or destruction of any such property. This lien and security interest may be foreclosed by public or private sale upon ten (10) days notice of sale to tenant and the Landlord shall have the right to become the purchaser upon being the highest bidder at such sale. Landlord agrees to subordinate this lien to Tenant's financing of its business equipment, furniture and fixtures, and provided Tenant is not in default under the terms of this Lease, any proceeds of Tenant's insurance may be used by Tenant to replace or rebuild its equipment, furniture or fixtures or re-establish its business.

SECTION 58. MISCELLANEOUS.

(a) As used in this Lease, the term "Force Majeure" shall mean fire, catastrophe, casualty, strikes or labor trouble, civil commotion, acts of God or the public enemy, governmental prohibitions or regulations, or inability or difficulty in obtaining materials, or any other causes beyond Landlord's or Tenant's control.

(b) Tenant agrees that neither Landlord, nor Landlord's agents, employees or representatives nor any other party has made, and Tenant does not rely on, any representations, warranties or promises with respect to the Center, the Premises or this Lease, except as herein expressly set forth.

(c) The Section headings of this Lease are for convenience only and shall not limit or define the meaning or content hereof. All pronouns and any variations thereof shall be deemed to refer to the masculine, feminine, neuter, singular or plural, as the identity of the person or persons may require.

(d) Anything elsewhere to the contrary notwithstanding, Tenant shall look solely to the estate of Landlord in the Center for the satisfaction of each and every remedy of Tenant in the event of any default or breach by Landlord with respect to any of the terms, covenants and conditions of this Lease to be observed and/or performed by Landlord, and no other property or assets of Landlord or any general partner of Landlord or their respective successors and assigns shall be subject to levy, execution or other enforcement procedure for the satisfaction of Tenant's remedies, such exculpation of liability to be absolute and without any exceptions whatsoever.

(e) If Tenant or Landlord is a corporation, partnership or limited liability company, each individual executing this Lease on behalf of said party represents and warrants that he is duly authorized to execute and deliver this Lease on behalf of the entity in accordance with a duly adopted resolution of the Board of Directors of said corporation or in accordance with the by-laws of said corporation, or in accordance with the partnership agreement or operating agreement for such entity, and that this Lease is binding upon said entity in accordance with its terms. If Tenant or Landlord is a corporation, the applicable party shall, upon execution of the Lease, deliver to the other a certified copy of a resolution of the Board of Directors of said corporation authorizing or ratifying the execution of this Lease.

(f) This Lease shall be governed by the laws of the State in which the Center is located.

SECTION 59.  GUARANTY.

This Lease is hereby conditioned and made contingent upon the execution and delivery by Jeffrey Wu of a guaranty of the terms and provisions of this Lease in the form annexed hereto as Schedule C.

SECTION 60.  TERMINATION OF PRIOR LEASE.

Landlord and Tenant agree that upon the Commencement Date of this Lease, the prior Lease Agreement between Landlord and Tenant for the Existing Space as referred to in Section 2(a) of this Lease, shall be deemed terminated and shall be of no further force or effect.

IN WITNESS WHEREOF, this Lease has been executed and delivered as of the 15th day of September, 2011.

WITNESS:

_____

WITNESS:

_____

HONG KONG SUPERMARKET OF EAST BRUNSWICK, INC.  (Tenant)

By:_____
                                            9/15/11

HARARY GROUP (Landlord)

By:_____
    Leon Harary, Partner

SCHEDULE A

The Premises

# SCHEDULE B

## Payment of Basic Rent

| Lease Year(s) | Rent Per Sq. Ft. | Annual Rent | Monthly Installment |
|---|---|---|---|
| * 1  2012-2013 | $10.75 | $578,350.00 | $48,195.83 |
| 2  2013-2014 | $10.75 | $578,350.00 | $48,195.83 |
| 3  2014-2015 | $11.40 | $613,320.00 | $51,110.00 |
| 4  2015-2016 | $11.40 | $613,320.00 | $51,110.00 |
| 5  2016-2017 | $11.40 | $613,320.00 | $51,110.00 |
| 6  2017-2018 | $11.90 | $640,220.00 | $53,351.67 |
| 7  2018-2019 | $11.90 | $640,220.00 | $53,351.67 |
| 8  2019-2020 | $11.90 | $640,220.00 | $53,351.67 |
| 9  2020-2021 | $11.90 | $640,220.00 | $53,351.67 |
| 10  2021-2022 | $11.90 | $640,220.00 | $53,351.67 |
| 11 | $12.30 | $661,740.00 | $55,145.00 |
| 12 | $12.30 | $661,740.00 | $55,145.00 |
| 13 | $12.30 | $661,740.00 | $55,145.00 |
| 14 | $12.30 | $661,740.00 | $55,145.00 |
| 15 | $12.30 | $661,740.00 | $55,145.00 |

### First Renewal Term

| Lease Year(s) | Rent Per Sq. Ft. | Annual Rent | Monthly Installment |
|---|---|---|---|
| 16 | $12.90 | $694,020.00 | $57,835.00 |
| 17 | $12.90 | $694,020.00 | $57,835.00 |
| 18 | $12.90 | $694,020.00 | $57,835.00 |
| 19 | $12.90 | $694,020.00 | $57,835.00 |
| 20 | $12.90 | $694,020.00 | $57,835.00 |

### Second Renewal Term

| Lease Year(s) | Rent Per Sq. Ft. | Annual Rent | Monthly Installment |
|---|---|---|---|
| 21 | $13.55 | $728,990.00 | $60,749.17 |
| 22 | $13.55 | $728,990.00 | $60,749.17 |
| 23 | $13.55 | $728,990.00 | $60,749.17 |
| 24 | $13.55 | $728,990.00 | $60,749.17 |
| 25 | $13.55 | $728,990.00 | $60,749.17 |

### Third Renewal Term

| Lease Year(s) | Rent Per Sq. Ft. | Annual Rent | Monthly Installment |
|---|---|---|---|
| 26 | $14.23 | $765,574.00 | $63,797.83 |
| 27 | $14.23 | $765,574.00 | $63,797.83 |
| 28 | $14.23 | $765,574.00 | $63,797.83 |
| 29 | $14.23 | $765,574.00 | $63,797.83 |
| 30 | $14.23 | $765,574.00 | $63,797.83 |

\* In accordance with Section 2(a) of this Lease, until the Entire Premises Rent Commencement Date, Tenant shall only be required to pay Basic Rent for the Existing Space at the applicable monthly rental rate set forth in the Lease Modification Agreement dated as of July 1, 1997 between Landlord and Tenant (currently $38,187.84 per month for Basic Rent plus Additional Rent as defined in the existing lease).

## GUARANTY

Reference is made to a Lease (the "Lease") dated September 15, 2011, between HARARY GROUP, a New Jersey Partnership, as Landlord, and HONG KONG SUPERMARKET OF EAST BRUNSWICK, INC., a New Jersey Corporation, as Tenant.

FOR VALUE RECEIVED, and in consideration for, and as an inducement to Landlord entering into the Lease, the undersigned, JEFFREY WU, as Guarantor, residing at 56-72 49th Place, Maspeth, NY 11378 , hereby absolutely and unconditionally guarantees to Landlord, its successors and assigns, the full, prompt and punctual performance and observance of all of the covenants, conditions and agreements of the Lease, to be performed and observed by Tenant, its successors and assigns, during the term of the Lease, and any extensions thereof, and agrees that the validity of this Guaranty and the obligations of the Guarantor hereunder shall not be terminated, affected or impaired because of the assertion by Landlord against Tenant of any rights or remedies reserved to Landlord under the Lease, or the waiver by Landlord of, or failure of Landlord to enforce, any of the terms, covenants or conditions of the Lease, as modified, or the granting of any indulgence or extension of time to Tenant, or the assignment of the Lease or subletting of the Premises.

The Guarantor's liability pursuant to this Guaranty shall not exceed an amount equal to six (6) month's Basic Rent and Additional Rent due under the terms of the Lease, as modified, determined from the date of the default or other event giving rise to Landlord's claim(s) against the Guarantors hereunder.

This Guaranty shall apply to any and all extensions, modifications or amendments of the Lease, now or in the future.

Guarantor further agrees that his liability under this Guaranty shall be primary and in any right of action which shall accrue to Landlord under the Lease, Landlord may, at Landlord's option, proceed against the Guarantor without having commenced any action against or having obtained any judgment against Tenant.

Any notices or other communications given under or pursuant to this Guaranty shall be in writing and shall be given by registered or certified mail, return receipt requested, postage prepaid, or by recognized overnight delivery service (a) if to Guarantor, at the address set forth above or at such other address as Guarantor may designate by written notice to Landlord, or (b) if to Landlord, at the address of Landlord set forth in the Lease or at such other address as Landlord designates by written notice to the Guarantor, with a copy to Richard Epstein, Esq., 2 Bucks Lane, Marlboro, NJ 07746, or (c) if to Tenant, at the address of Tenant set forth in the Lease or at such other address as Tenant designates by written notice to Landlord.

This Guaranty shall be binding on Guarantor, its successors and assigns, and shall inure to the benefit of Landlord, its successors and assigns.

WITNESS the execution hereof on this 15th day of September, 2011.

Witness:

By: _____

By: _____ Jeffrey Wu

9/15/11

Exclusive Use Provisions for the Center

**Burger King:** Landlord is prohibited from selling, leasing or permitting the use of any space owned by Landlord for a restaurant use within a 2000 foot radius of the Center as to any national brand or chain store hamburger, chicken, mexican food and hot dog fast food operation, including Wendy's, McDonalds, Hardees, Roy Rogers, Taco Bell, Boston Market, Kentucky Fried Chicken locations and any similar fast food hamburger, chicken, mexican food or hot dog chain operation. By way of example and not by way of limitation, this prohibition shall not apply to any buffet or cafeteria style restaurant, any restaurant having waiter or waitress service, any pizzeria, including Pizza Hut, any fish and chips fast food operation, any Chinese style restaurant or any snack bar, concession or food service which is ancillary or secondary to any other tenant's principal use of their premises.

**Citibank:** No person or entity other than Tenant has the right (under any lease, purchase contract or other agreement) to use any portion of the Shopping Center for (i) the operation of a Retail Bank and/or (ii) the operation of an ATM. The term **"ATM"** shall mean an automated teller machine offering electronic fund transfer services whose function, among other things, is to permit customers to withdraw cash from accounts or credit lines, deposit funds, and repay loans made to such customers or transfer funds between such customers' accounts, or any other automated or electronic machine which provides any of the services provided by Tenant.  As used herein, the term **"Retail Bank"** shall mean a retail banking institution, consumer banking institution, savings and loan association, credit union, stock brokerage company or other financial planning company which, among other things, accepts deposits from customers, provides stock brokerage, mortgage brokerage and/or financial planning services.

**Coldwell Banker:** Landlord agrees not to lease any space in the Center for use as a real estate sales office, title company or escrow company.

Exhibit A-1

Schedule A



Hong Kong
Additional
Space

Hong Kong
Existing
Space

36,800 sq.ft
(actual)

## Business Plan

The proposed Asian Specialty Grocery Food and Service Center consists of an Asian specialty grocery food store and a service center. The grocery food store provides high quality, fresh food items, vegetables, fish, meat and a health line food product to customers for the Middlesex and Monmouth County customers.

### 1.1  Service Center

The service center will conveniently provide the following services to address the needs for special group of customers:

- o  Asian Newspapers, magazines, books, music and video tapes, and film development.

- o  Accounting and legal services especially needed for the customers who feel comfortable to discuss their needs with those who speak their own language.

- o  Beauty salon (it is a specialty due to the hair style and its culture)

- o  Other services that will be demanded by our customers.

### 1.2  Grocery Store Products

Except dry or can goods, most fresh food items will be transported daily from our wholesalers, so that the quality and freshness will be guaranteed.

#### 1.2.1  Fresh Daily Products

- o  Meat, beef, and some porks

- o  Poultry, American and Chinese breed chicken

- o  Barbecue and Cooked Food (Deli Type Business); Barbecue rib, roasted chicken and duck and other items

- o  Seafood; Fresh fish and shrimps

- o  Vegetable; Seven most popular Chinese and American vegetables

- o  Bean Products; Bean Sprouts, bean curds

- o  Fresh fruits; between six to eight most popular fruits

- o  Salad; Daily fresh vegetable and fruit salad

- o  Other products that will fit our business

#### 1.2.2  Dry/Can Products

- o  High quality goods that would not be available from regular supermarkets

- o  Health goods which have high nutrition, good taste, with low calorie and fats.

### 1.3  Quality of the Service

Good services, high quality, and low cost will be the trade mark of our business. This trade mark enable us to success in Hong King, and we believe customers are also demanding here just as people elsewhere.

